[No. 86033-5.   En Banc.]
Argued February 28, 2012.    Decided June 14, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY MARQUISE EMERY, JR., *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. AARON EDWARD OLSON, *Petitioner*.

*Anthony Marquise Emery Jr.*, pro se.

*Lila J. Silverstein* (of *Washington Appellate Project*) and *Valerie Marushige*, for petitioners.

*Mark E. Lindquist, Prosecuting Attorney*, and *Thomas C. Roberts, Deputy*, for respondent.

¶1 FAIRHURST, J. — In this case, we resolve four issues that arose after Anthony Marquise Emery Jr. and Aaron Edward Olson were convicted at a joint trial of first degree kidnapping, first degree robbery, first degree rape, and first degree accomplice rape. They are (1) whether the trial court erred in denying Olson's motions to sever, and whether Emery's counsel was ineffective in failing to move for severance; (2) whether the prosecutor's statements during closing argument constitute misconduct that entitles Emery and Olson to a new trial; (3) whether the trial court erred in denying Emery's motion for a mistrial based on Olson's outbursts; and (4) whether Emery is entitled to a new trial based on cumulative error. The Court of Appeals affirmed the convictions, and we affirm the Court of Appeals.

## I. FACTS

¶2 On February 27, 2006, GC[1] was working at Walgreens in Tacoma, Washington. She attempted to leave work shortly after 11:00 p.m., but her key would not open the car door. GC called her boyfriend for help.

---

[1] We refer to GC by her initials to protect her identity as a victim of sexual assault.

¶3 As GC turned to go back into Walgreens, two men appeared in the parking lot. A "white guy" pointed a gun at GC's stomach, and a "Filipino kind of guy" stood by him. 3 Verbatim Report of Proceedings (VRP) at 100. The white guy seized GC's cell phone and demanded money. When GC said she did not have any money, the white guy ordered her into her car.[2] GC dumped the contents of her pockets in the parking lot so her boyfriend would know something had happened to her.

¶4 The white guy ordered GC to drive to a darker parking lot and said, "[Y]ou don't have any money, so go to the back side because we are going to rape you." 3 VRP at 112. In an attempt to avoid being raped, GC told the men she was pregnant.[3] The white guy then ordered GC to perform oral sex. He pointed the gun at her and said, "[Y]ou have to do it or I'm going to kill you." 3 VRP at 114.

¶5 The white guy forced GC to perform oral sex on him while the Filipino guy stood outside. After the white guy ejaculated, GC wiped some of his semen on her pants. The Filipino guy then forced GC to perform oral sex on him while the white guy stood outside. After he ejaculated, GC wiped his semen on her smock. The white guy reentered the car and drove GC to a different parking lot where the men got out of the car. As they exited, the white guy said, " 'I know where you work. If you say anything, we're going to kill you.' " 4 VRP at 133.

¶6 GC drove to the home of a friend. GC began crying, screaming, and vomiting as she told her friend she had been raped. After her friend's husband called 911, responding law enforcement officials collected forensic evidence from GC and photographed GC's vomit in the toilet. GC later

---

[2] The key worked this time.

[3] GC was not pregnant.

described her attackers to a forensic sketch artist, who made composite drawings of the two suspects.[4]

¶7 The police later received a tip that Olson had claimed responsibility for a series of rapes and robberies in the area. The informant said Olson associated with a "Samoan" male who closely resembled the sketch of one of the suspects in GC's case. Clerk's Papers (CP) (Olson) at 5. After a records check indicated that Olson and Emery were suspects in a residential burglary, a detective created photomontages that included Emery's and Olson's photographs. GC positively identified Emery from the photomontage but was unable to identify the second rapist.

¶8 The State obtained orders to take deoxyribonucleic acid (DNA) samples from Emery and Olson. The Washington State Patrol Crime Lab determined that Olson's DNA matched the semen on GC's pants and Emery's DNA matched the semen on GC's smock. Emery and Olson were each charged with first degree kidnapping, first degree robbery, first degree rape, and first degree accomplice rape. The case proceeded to trial.

## II. PROCEDURAL HISTORY

¶9 Olson moved to sever his trial from Emery's in a pretrial motion,[5] arguing that his mistaken identity defense was mutually antagonistic to Emery's consent defense. The trial court questioned Emery's counsel as follows:

[COUNSEL]: We are not providing an alibi defense, Your Honor. [Emery] would testify as to the issue of a weapon, the nonexistence of a weapon.

THE COURT: All right. He will otherwise acknowledge being there.

---

[4] GC described the white guy as five feet, nine inches tall, weighing 150 pounds and having blonde hair. She testified that he was wearing a red baseball cap at the time of the attack. Olson is approximately six feet tall and has "dark red, orange" hair. 8 VRP at 710. He testified that he owns a red baseball cap.

[5] Emery moved to sever other criminal counts, and his motion was granted.

[COUNSEL]: Apparently so, yes, Your Honor.

THE COURT: He is intending to acknowledge some or all of these acts?

[COUNSEL]: Yes, Your Honor. Some of the acts, yes.

THE COURT: With respect to at least the counts that have been severed for this trial, he is going to indicate that Mr. Olson was present?

[COUNSEL]: If he is asked, yes, Your Honor.

1 VRP at 45-46. When further questioned, Emery's counsel repeated that Emery "would testify that the events occurred, [Olson] was there, and there was no gun." 1 VRP at 55.

¶10 The trial court noted that each defendant was charged as a principal and an accomplice actor in the accomplice rape charge and that the evidence would be the same for each defendant. It also noted that Olson was entitled to cross-examine Emery if Emery testified. The trial court then reasoned, "[I]f you believe [Emery], you could still say, but Olson has shown that he wasn't the other guy. Emery may be right about the gun, but he is wrong about who he was with." 1 VRP at 56-57. The trial court concluded that Emery's and Olson's defenses were not antagonistic and denied Olson's motion to sever. Olson unsuccessfully renewed his severance motion before the State presented its first witness, and after the State rested its case. Emery's counsel did not argue in favor of severance.

¶11 The trial lasted eight days. GC testified that she was raped and identified Emery as one of the rapists. GC did not identify Olson, but a State's witness testified that Emery spent a lot of time with Olson. GC testified that she did not cry during the attack but became hysterical afterward. GC's friend and two responding police officers also testified that GC was hysterical, screaming, crying, and vomiting after the attack. The State produced video evidence from a security camera that corroborated the first portion of GC's

testimony[6] and a photograph of GC's vomit in the toilet. The State also offered the contents of GC's pockets and the testimony of the officer who found them in the Walgreens parking lot. Finally, the State presented a DNA expert who testified that the DNA profiles collected from GC's clothes matched those of Emery and Olson. The expert testified that the chance of a random match was 1 in 2.3 to 2.4 quintillion—greater than the total number of people who have ever lived on the planet. 7 VRP at 569.

¶12 Emery testified that he was there, Olson was with him, and GC performed oral sex on them both, but there was no gun and GC was not forced to do anything she did not want to do. Emery testified that he had assumed Olson knew GC. He also testified that he could not hear the conversation between GC and Olson because he was listening to music through headphones. Olson interrupted Emery, saying, "You are sitting there lying, man. . . . This is perjury. . . . I [have] been wrongly accused." 8 VRP at 693. The trial court excused the jury and cautioned Olson that he could be removed. Emery unsuccessfully moved for a mistrial. The trial court instructed the jury to disregard Olson's comments. Olson interrupted Emery again later, saying, "That's a lie. I was not there." 8 VRP at 708. The court stated, "Mr. Olson, not another outburst, sir." *Id.*

¶13 Olson testified that he and Emery were friends but he "was not there that night." 8 VRP at 733. He testified that he was at home with a foot injury and implied the DNA evidence linking him to GC was the result of laboratory error.

¶14 The prosecutor made the following statements in closing:

> [I]n order for you to find the defendant not guilty, you have to ask yourselves or you'd have to say, quote, I doubt the defen-

---

[6] In the video, GC exits the store, walks to her car and tries to open each door several times. She talks on the phone. Two men appear behind a vehicle parked in a stall close to GC. GC's vehicle then leaves the parking lot. GC testified that the men were with her in the car. *See* 6 VRP at 500-05.

dant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank.[7]

. . . .

. . . I want to talk to you right now [about] a Latin term, "verdictum." The Latin term "verdictum" I'm told is the Latin root for the English word "verdict." The literal translation of "verdictum" into the English language is to speak the truth. Your verdict should speak the truth.

In this case, the truth of the matter, the truth of these charges, are that Aaron Olson is guilty of Robbery in the First Degree, Kidnap in the First Degree, . . . and Rape in the First Degree, which is the same for Tony Emery, for the offenses that he committed on February 27th, 2006, against [GC].

Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did.

9 VRP at 830-32. Neither Emery nor Olson objected to the prosecutor's statements.

¶15 The jury convicted Emery and Olson of all charges. Emery unsuccessfully moved for a new trial based on the trial court's denial of Olson's motion to sever and his own motion for a mistrial. Emery and Olson appealed to Division Two of the Court of Appeals, and the court affirmed their convictions. *State v. Emery*, 161 Wn. App. 172, 253 P.3d 413 (2011). Each defendant filed a separate petition for review, and we granted every issue in each petition. *State v. Emery*, 172 Wn.2d 1014, 262 P.3d 63 (2011).

## III. ISSUES

¶16 A. Did the trial court abuse its discretion in denying Olson's motions to sever, and was Emery's counsel ineffective in failing to move for severance?

---

[7] The prosecutor used a PowerPoint slide to illustrate this statement.

¶17 B. Do the prosecutor's statements during closing argument constitute misconduct that warrants a new trial?

¶18 C. Did the trial court err in denying Emery's motion for a mistrial based on Olson's outbursts?

¶19 D. Is Emery entitled to a new trial based on cumulative error?

## IV. ANALYSIS

A. The trial court did not abuse its discretion in denying Olson's motions to sever, and Emery's counsel was not ineffective in failing to move for severance

¶20 A trial court has broad discretion to grant a severance when it is deemed appropriate or necessary "to promote a fair determination of the guilt or innocence of a defendant." CrR 4.4(c)(2)(i). The burden is on the defendant to come forward with sufficient facts to warrant the exercise of discretion in his or her favor. *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991); *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982). We do not disturb a trial court's decision to grant or deny a severance absent a manifest abuse of discretion. *Hoffman*, 116 Wn.2d at 74.

¶21 Separate trials are disfavored in Washington. *State v. George*, 150 Wn. App. 110, 206 P.3d 697 (2009). "Mutually antagonistic defenses may on occasion be sufficient to support a motion for severance," but they are not per se prejudicial as a matter of law. *Grisby*, 97 Wn.2d at 508. A defendant seeking severance based on conflicting defenses must demonstrate " 'that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty.' " *Id.* (quoting *United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980)). "[T]o support a finding that the trial court abused its discretion, the defendant must be able to point to specific prejudice." *Id.* at 507.

### 1. *Olson fails to establish his severance claim*

¶22 Olson contends that he and Emery presented antagonistic, mutually exclusive defenses and severance was necessary for Olson to have a fair trial. Relying on *State v. Medina*, Olson argues that he was prejudiced because the defenses conflicted to the point of being irreconcilable. 112 Wn. App. 40, 52-53, 48 P.3d 1005 (2002) ("Specific prejudice may be demonstrated by showing 'antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive.'" (quoting *State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995))). The State argues and the trial court found that Emery and Olson did not present mutually antagonistic defenses because Olson could maintain his alibi defense and assert that the white guy was someone else. The Court of Appeals found that Emery and Olson presented mutually antagonistic defenses because Olson's defense was a complete alibi defense, and Emery's defense was that Olson was present and entirely culpable. However, the Court of Appeals held that Olson cannot show specific prejudice because even in a separate trial, Olson's alibi evidence would have had to overcome GC's testimony and corroborating evidence: the contents of GC's pockets found in the parking lot, the testimony of GC's friend, police testimony about GC's hysterical demeanor, and Olson's DNA.[8]

¶23 We hold that Emery and Olson presented mutually antagonistic defenses but Olson cannot show prejudice. Olson defended by claiming that he was at home. Emery defended by claiming that GC and Olson had entered into an agreement for mutual sex and he asked Olson if he could also have sex with GC. Because these defenses depend on propositions that cannot both be true, they are mutually antagonistic. However, Olson cannot point to

---

[8] The Court of Appeals' reasoning here is somewhat flawed because, with the exception of the DNA, the listed evidence merely demonstrates that GC was attacked, not that Olson was the attacker.

specific prejudice. First, Olson cannot show that the jury unjustifiably inferred his guilt from the conflict alone because the direct and circumstantial evidence against Olson was strong. GC testified that she was raped by two men. The State introduced video evidence showing two men in the parking lot. GC identified Emery as one of the men, and an independent witness testified that Emery spent a lot of time with Olson. Olson himself also testified that he and Emery were friends. Most importantly, the State linked Olson to the rape through his DNA. Second, the trial court gave appropriate instructions directing the jury to decide each defendant's case separately and jurors are presumed to follow their instructions. *See, e.g., Grisby*, 97 Wn.2d at 509 (considering jury instructions as a factor to deny defendant's severance claim). The prosecutor also told the jury, "This case involves two defendants . . . but it doesn't mean that you get to convict both of them because you are convinced that one of them committed the offense. You must evaluate the evidence separately and evaluate the crimes against each one of them separately." 9 VRP at 796. Third, because Olson "offer[ed] nothing to suggest that [Emery's] testimony would not have been available and admissible against him if the trials had been severed," Olson fails to show that a separate trial would have been different from the trial he received. *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996).

### 2. *Emery waived the severance issue and fails to establish an ineffective assistance of counsel claim*

¶24 Emery claims he was also prejudiced by the trial court's denial of Olson's motion to sever. But as the Court of Appeals correctly notes, Emery waived the severance issue by not raising it at trial. *See* CrR 4.4(a)(1), (2) (severance is waived if motion to sever is not made before trial, before the close of evidence, or at the close of evidence).

¶25 Emery also argues that his counsel was ineffective in failing to move for severance. A defendant

claiming ineffective assistance of counsel must show that counsel's performance was objectively deficient and resulted in prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Courts strongly presume that counsel's representation was effective. *Id.* at 335. To demonstrate deficient performance, a "defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *Id.* at 336. To establish prejudice based on an improper joint trial, a defendant must show that a competent attorney would have moved for severance, that the motion likely would have been granted, and that there is a reasonable probability he would have been acquitted at a separate trial. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 711, 101 P.3d 1 (2004). The failure to show either deficient performance or prejudice defeats a defendant's claim. *McFarland*, 127 Wn.2d at 334-35.

¶26 Emery claims that his counsel's failure to move for severance constitutes an objectively deficient performance, particularly in light of Olson's outbursts. He also claims that his counsel did not make a strategic decision to seek a joint trial, noting that counsel moved for a new trial based on the trial court's denial of Olson's severance motion. But Emery fails to show deficient performance. Emery's defense strategy was to admit the sex act but claim he lacked criminal intent because he thought GC had agreed to sex. GC positively identified Emery, and DNA evidence linked Emery to the crimes. Based on the strength of the State's evidence against Emery, Emery's counsel could have made a strategic decision to seek a joint trial—to make Emery appear more reasonable than Olson. And a posttrial motion does not prove the absence of a trial strategy. Because Emery fails to establish deficient performance, we need not address the issue of prejudice.[9]

---

[9] Even if Emery could establish deficient performance, Emery cannot show prejudice. Olson's motion to sever was denied, so Emery cannot show that his own motion would have been granted. Further, because GC testified that she was

¶27 In sum, neither Olson nor Emery is entitled to a new trial based on the denial of Olson's severance motions. Olson can show that he and Emery presented mutually antagonistic defenses but cannot show prejudice. Emery waived the severance issue and cannot establish his ineffective assistance of counsel claim.

B. The prosecutor's statements during closing argument are improper but do not warrant a new trial

¶28 As a threshold matter, we address the defendants' contention that we should change our standard of review. In a prosecutorial misconduct claim, the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Emery and Olson contend that we should abandon this standard in favor of the constitutional harmless error standard, which requires the State to prove beyond a reasonable doubt that the State's misconduct did not affect the verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

¶29 Emery and Olson contend that the constitutional harmless error standard is appropriate largely because the prosecutor's remarks violated their right to the presumption of innocence, which is "the most fundamental aspect of our criminal justice system," and shifted the burden of proof. *State v. Bennett*, 161 Wn.2d 303, 319, 165 P.3d 1241 (2007). Olson cites two foreign cases applying the constitutional error standard in similar contexts: *People v. Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432 (1966) (prosecutorial misconduct undermined the defendant's right to the presumption of innocence beyond a reasonable doubt) and *People v. Green*, 131 Mich. App. 232, 234-35, 345 N.W.2d 676 (1983) (prosecutor's statements shifted the burden of proof and were not

raped and positively identified Emery, and other evidence including DNA corroborated GC's testimony, Emery cannot show a reasonable probability that he would have been acquitted in a separate trial.

harmless beyond a reasonable doubt). Olson further notes that a jury instruction misstating the reasonable doubt standard is subject to automatic reversal without any showing of prejudice. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

¶30 We have long held that the constitutional harmless error standard applies to direct constitutional claims involving prosecutors' improper arguments. *See, e.g., State v. Easter*, 130 Wn.2d 228, 922 P.2d 1285 (1996) (prearrest silence); *State v. Fricks*, 91 Wn.2d 391, 396-97, 588 P.2d 1328 (1979) (postarrest silence). We have recently held that the constitutional harmless error standard applies "when a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

¶31 We decline to adopt the constitutional harmless error standard here for three reasons. First, we have already declined to apply the constitutional harmless error standard in prosecutorial misconduct cases when a prosecutor makes a truth statement and misstates the burden of proof.[10] *State v. Warren*, 165 Wn.2d 17, 26 n.3, 195 P.3d 940 (2008). In *Warren*, the prosecutor first said, " 'And for them to ask you to infer everything to the benefit of the defendant is not reasonable.' " *Id.* at 24 (quoting Report of Proceedings (RP) (Feb. 20, 2003) at 98-99). She then said,

---

[10] The five-justice majority speculated whether the constitutional harmless error standard might apply in a case where prosecutorial misconduct "directly" violates a defendant's constitutional right but ultimately declined to reach the issue. *State v. Warren*, 165 Wn.2d 17, 26 n.3, 195 P.3d 940 (2008). One dissenting justice would have reversed Warren's conviction under either standard based on the high degree of prejudice and the "watered down jury instruction." *Id.* at 36 (Alexander, C.J., concurring in part with dissent). Two dissenting justices would have reversed Warren's conviction based on the improper instruction but expressly agreed with the majority that prosecutorial misconduct claims are not subject to the constitutional harmless error standard of review. *Id.* at 38 (Madsen, J., concurring in part with dissent). Only one dissenting justice would have reversed Warren's conviction under a constitutional harmless error standard. *Id.* at 40 (Sanders, J., dissenting).

" 'Reasonable doubt does not mean give the defendant the benefit of the doubt, and that is clear when you read the definition.' " *Id.* She later said:

> "Finally, in this case I want to point out that this entire trial has been a search for the truth. And it is not a search for doubt. I talked to you about the fact that you must find the defendant guilty beyond a reasonable doubt . . . . But reasonable doubt does not mean beyond all doubt and it doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt."

*Id.* at 25 (quoting RP (Feb. 20, 2003) at 104).[11] Even though the prosecutor mischaracterized the trial as a search for truth and undermined the presumption of innocence, we applied our established standard of review. Under this standard, we held that any prejudice was cured even though the trial court's curative instruction was imperfect.[12]

¶32 Second, this case does not involve the apparently deliberate injection of racial bias, but an improper attempt to explain "an esoteric concept, not always well understood by lawyers and judges." *Bennett*, 161 Wn.2d at 319. The prosecutor in *Monday* committed egregious racial misconduct, repeatedly referring to the police as " 'po-leese' " and arguing that " 'black folk don't testify against black folk.' " 171 Wn.2d at 674 (quoting VRP (May 30, 2007) at 29-30). There we said, "The notion that . . . the prosecutor[ ] should seek to achieve a conviction by resorting to racist arguments is so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should

---

[11] In reviewing these "remarkable misstatement[s]," we said "we would not hesitate to conclude" that they constituted reversible error absent a curative instruction. *Id.* at 28.

[12] We also applied our traditional prosecutorial misconduct standard in *Thorgerson*, 172 Wn.2d 438, even though the defendant claimed that the prosecutor had improperly conveyed that the defendant, not the State, carried the burden of proof to produce evidence regarding the victim's credibility. There, as here, the defendant's constitutional due process claims were "tied directly to his claims of prejudicial prosecutorial misconduct." *Id.* at 455.

not need to be explained." *Id.* at 680. In contrast, the reasonable doubt concept has challenged courts and attorneys for many years. *See, e.g., Bennett,* 161 Wn.2d 303 (reasonable doubt instruction is constitutionally adequate but its language is problematic); *State v. Castle,* 86 Wn. App. 48, 62, 935 P.2d 656 (1997) (reasonable doubt instruction did not lower State's burden of proof); *State v. Cervantes,* 87 Wn. App. 440, 942 P.2d 382 (1997) (reasonable doubt instruction requires no specific language). And while the prosecutor's attempted explanations are certainly and seriously wrong, there is no evidence that the prosecutor was acting in bad faith or attempting to inject bias.

¶33 Finally, closing argument cannot be likened to instructional error. Because jurors are directed to disregard any argument that is not supported by the law and the court's instructions, a prosecutor's arguments do not carry the "imprimatur of both the government and the judiciary." Suppl. Br. of Pet'r Olson at 9.

1. *The prosecutor's statements are improper*

¶34 Under our established standard of review, Emery and Olson must first show that the prosecutor's statements are improper. They contend that the prosecutor's "fill in the blank" statements constitute misconduct because they misstate the reasonable doubt standard and impermissibly undermine the presumption of innocence. The Court of Appeals held that "the argument was improper because it subverted the presumption of innocence by implying that the jury had an initial affirmative duty to convict and that the defendant bore the burden of providing a reason for the jury not to convict him." *Emery,* 161 Wn. App. at 194 (citing *State v. Anderson,* 153 Wn. App. 417, 431, 220 P.3d 1273 (2009)).

¶35 We hold that the State's "fill in the blank" argument is improper. The argument starts with the phrase "[I]n order for you to find the defendant not guilty." 9 VRP at 830. This is a bad beginning because a jury need

do nothing to find a defendant not guilty. And although the argument properly describes reasonable doubt as a "doubt for which a reason exists," it improperly implies that the jury must be able to articulate *its* reasonable doubt by filling in the blank. This suggestion is inappropriate because the State bears the burden of proving its case beyond a reasonable doubt, and the defendant bears no burden. *State v. Camara*, 113 Wn.2d 631, 638, 781 P.2d 483 (1989) (citing *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). By suggesting otherwise, the State's "fill in the blank" argument subtly shifts the burden to the defense. *See State v. Gregory*, 158 Wn.2d 759, 859-60, 147 P.3d 1201 (2006) (arguments that shift the burden of proof to the defense constitute misconduct).

¶36 Emery and Olson next contend that the prosecutor's "truth" statements are improper because they mischaracterize the role of the jury. The Court of Appeals held that the truth statements are improper because they suggest that the jury's role is to solve the case. We hold that the prosecutor's truth statements are improper. The jury's job is not to determine the truth of what happened; a jury therefore does not "speak the truth" or " 'declare the truth.' " *Anderson*, 153 Wn. App. at 429. Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt. *Winship*, 397 U.S. at 364.

### 2. *Emery and Olson fail to show the requisite prejudice*

¶37 Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced under one of two standards of review. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Anderson*, 153 Wn. App. at 427 (citing *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984)). If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so fla-

grant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." *Thorgerson*, 172 Wn.2d at 455.

¶38 Olson contends that the improper statements are flagrant because they violate due process and were made "as a matter of course . . . in many criminal trials." Suppl. Br. of Pet'r Olson at 5. Emery alleges that the misconduct was particularly flagrant and ill intentioned because the prosecutor tampered with the jury instructions, contrary to our direction in *Bennett*, 161 Wn.2d 303. The State contends that the prosecutor's misconduct was not flagrant and ill intentioned. It implies that the conduct could not have been " 'extremely, flauntingly, or purposefully conspicuous' " because it has never been objected to at trial and then reviewed on appeal. Suppl. Br. of Resp't at 10 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 862-63 (2002)). It also notes that all of the trials involving "fill in the blank" arguments occurred before the first appeal was filed, so the prosecutor was not acting in flagrant disregard of a published opinion. The State further contends that the prosecutor properly explained the burden of proof and mirrored the jury instruction, so his misstatements were not ill intentioned.

¶39 Before analyzing the prosecutor's misconduct here, we pause to clarify our precedent. Our standards of review are based on a defendant's duty to object to a prosecutor's allegedly improper argument. *See* 13 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 4505, at 295 (3d ed. 2004) ("If either counsel indulges in any improper remarks during closing argument, the other must interpose an objection at the time they are made. This is to give the court an opportunity to correct counsel, and to

caution the jurors against being influenced by such remarks."). Objections are required not only to prevent counsel from making additional improper remarks, but also to prevent potential abuse of the appellate process. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006) (were a party not required to object, a party " 'could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal' " (quoting *State v. Sullivan*, 69 Wn. App. 167, 173, 847 P.2d 953 (1993))); *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990) (" '[c]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal' " (alteration in original) (quoting *Jones v. Hogan*, 56 Wn.2d 23, 27, 351 P.2d 153 (1960))). An objection is unnecessary in cases of incurable prejudice only because "there is, in effect, a mistrial and a new trial is the only and the mandatory remedy." *State v. Case*, 49 Wn.2d 66, 74, 298 P.2d 500 (1956).

¶40 Based on these principles, "[m]isconduct is to be judged not so much by what was said or done as by the effect which is likely to flow therefrom."[13] *State v. Navone*, 186 Wash. 532, 538, 58 P.2d 1208 (1936). Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured. "The criterion always is, has such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a [defendant] from having a fair trial?" *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932).

¶41 Emery and Olson failed to object and fail to show that the prosecutor's comments engendered an incurable feeling of prejudice in the mind of the jury. First, the

---

[13] It is crucial to focus on the effect of the prosecutor's misconduct because even flagrant misconduct can be cured. *Warren*, 165 Wn.2d at 27 ("prosecutor's conduct was certainly flagrant," but given the context of the total argument, issues, evidence, and jury instructions, any error was cured).

prosecutor's misstatements "are not the type of comments which this court has held to be inflammatory," *State v. Brett*, 126 Wn.2d 136, 180, 892 P.2d 29 (1995), so there is no possibility that the prosecutor's statements engendered an "inflammatory effect," *State v. Perry*, 24 Wn.2d 764, 770, 167 P.2d 173 (1946); *see, e.g., State v. Belgarde*, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (prosecutor stated the American Indian group with which defendant was affiliated was " '*a deadly group of madmen*' " and " '*butchers*,' " and told them to remember " '*Wounded Knee, South Dakota*' " (quoting VRP)); *Reed*, 102 Wn.2d at 143-44 (prosecutor repeatedly called the defendant a liar, stated the defense had no case, said the defendant was a " '*murder two*,' " and implied the defense witnesses should not be believed because they were from out of town and drove fancy cars (quoting RP at 979-88)). The prosecutor's comments here, while clearly improper, "simply do not rise to such level." *State v. Elmore*, 139 Wn.2d 250, 292, 985 P.2d 289 (1999).

¶42 Instead, the prosecutor's remarks could potentially have confused the jury about its role and the burden of proof. Although these remarks touched upon the defendants' constitutional rights, remarks are not per se incurable simply because they touch upon a defendant's constitutional rights. *See State v. Smith*, 144 Wn.2d 665, 679, 30 P.3d 1245, 39 P.3d 294 (2001) ("Some improper prosecutorial remarks can touch on a constitutional right but still be curable."); *see also Warren*, 165 Wn.2d at 17 (prosecutor's misstatements about the burden of proof undermined the presumption of innocence but were not incurable). Rather than determining that the prosecutor's improper argument about the role of the jury and the burden of proof caused an automatic mistrial, a reviewing court must consider what would likely have happened if the defendant had timely objected.

¶43 The statements here are remarkably similar to the statements we analyzed in *Warren*, where the defendant did object at trial. As noted, the prosecutor there under-

mined the presumption of innocence, saying, " 'Reasonable doubt does not mean give the defendant the benefit of the doubt, and that is clear when you read the definition.' " *Warren*, 165 Wn.2d at 24 (quoting RP (Feb. 20, 2003) at 98-99). She also said that the " 'entire trial [had] been a search for the truth.' " *Id.* at 25 (quoting RP (Feb. 20, 2003) at 104-05). There we held that the prosecutor's misstatements were cured, even though the court's instruction was imperfect.

¶44 Because the very similar misstatements in *Warren* were cured by an improper instruction, the misstatements here could have been cured by a proper instruction. If either Emery or Olson had objected at trial, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden. Such an instruction would have eliminated any possible confusion and cured any potential prejudice stemming from the prosecutor's improper remarks. Emery's and Olson's claim necessarily fails, and our analysis need go no further.[14]

---

[14] Even if Emery and Olson could show that the statements are incurable, they cannot show a substantial likelihood that the statements affected the jury's verdict. In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). Taken in context of the total closing argument, the prosecutor clearly and repeatedly stated that the State bears the burden of proof and quoted the law directly from the jury instructions. Unlike the prosecutor's racial misconduct in *Monday*, which permeated the trial and "tainted nearly every lay witness's testimony," the prosecutor's misconduct here came at the end of an eight-day trial and was limited to nine sentences. 171 Wn.2d at 681. Further, the State's case was very strong, probably overwhelming. To show that GC did not consent to sex with Emery, the State offered GC's testimony that she was raped, GC's friend's and two officers' testimony that GC was hysterical, photographs of GC's vomit, the contents of GC's pockets, and testimony of the officer who had recovered GC's things from the Walgreens parking lot. The only conflicting evidence was Emery's testimony that GC was not forced to do anything she did not want to do. To identify Olson as the second rapist, the State offered GC's identification of Emery, GC's testimony that she was attacked by a white guy who was with Emery, a witness's testimony that Emery spent a lot of time with Olson, and Olson's DNA. The defense also admitted Emery's testimony that Olson was with Emery and Olson's testimony that he and Emery were friends. The only contrary evidence was Olson's testimony that he was home alone, resting with a foot injury. Finally, the

¶45  In sum, we decline to adopt the constitutional harmless error standard and the petitioners' claim fails. Emery and Olson can demonstrate that the prosecutor's statements are improper but cannot show that they were incurable or prejudicial.

C.  The trial court did not abuse its discretion by denying Emery's motion for a mistrial

¶46  The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried. *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). We review the trial court's denial of a mistrial for abuse of discretion, and we find abuse only " 'when no reasonable judge would have reached the same conclusion.' " *Id.* (quoting *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989)). "In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." *Id.* (citing *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).

¶47  Relying on *State v. Miles*, 73 Wn.2d 67, 436 P.2d 198 (1968), Emery contends that Olson's outbursts warrant a mistrial. We granted a mistrial in *Miles* after a police officer offered sworn testimony that "was calculated to and undoubtedly did implant in the minds of the jury the idea that the defendants had committed other robberies . . . and were therefore most likely to have committed the one charged." *Id.* at 70.

¶48  Unlike the officer's highly prejudicial testimony, Olson's outbursts do not warrant a mistrial. First, the

---

jury instructions stated a proper definition of "reasonable doubt" and expressly directed jurors "to disregard any remark, statement or argument that is not supported by . . . the law in [the court's] instructions." CP (Olson) at 175. The instructions also explained that "the defendant has no burden of proving that a reasonable doubt exists." 10 VRP at 860. We assume that juries follow their instructions. *Anderson*, 153 Wn. App. 417.

irregularity in Emery's case is not nearly as serious as the irregularity in *Miles* because it does not involve a police officer's sworn testimony about a defendant's past crimes, but a codefendant's unsworn statements about his codefendant's credibility. Second, Olson's outbursts were consistent with his later testimony, so they were merely cumulative of other evidence properly presented at trial. Finally, the trial court excused the jury and then properly instructed the jury to disregard Olson's initial outburst. As noted, jurors are presumed to follow the court's instructions. *See Anderson*, 153 Wn. App. 417.

D.   Emery is not entitled to a new trial based on cumulative error

¶49 Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). Emery asserts that the cumulative effect of the prosecutorial misconduct, the trial court's denial of Olson's motion to sever, and counsel's deficient performance and inability to present a complete defense entitle him to a new trial. But as discussed above, Emery was affected by only one error, and he failed to demonstrate the requisite prejudice. He is therefore not entitled to a new trial.

## V. CONCLUSION

¶50 We hold that (1) the trial court did not abuse its discretion by denying Olson's motions to sever, and Emery's counsel was not ineffective in failing to move for severance; (2) the prosecutor's statements during closing argument are improper but do not warrant a mistrial; (3) the trial court did not err in denying Emery's motion for mistrial based on Olson's outbursts; and (4) Emery is not entitled to a new

trial based on cumulative error. We affirm the Court of Appeals.

MADSEN, C.J., and C. JOHNSON, OWENS, J.M. JOHNSON, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.

¶51 CHAMBERS, J. (concurring) — I concur in result. However, I write separately because, in my view, the trial court should have granted Aaron Edward Olson's repeated motions to sever the trials. Defendants are entitled to fair trials. Motions to sever should be granted when the defendants will present such mutually antagonistic defenses to the charges against them that there is a serious risk that the jury "will unjustifiably infer that this conflict alone demonstrates that both are guilty," rendering the trial unfair. *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991) (citing *State v. Grisby*, 97 Wn.2d 493, 508, 647 P.2d 6 (1982)). This is one of those cases.

¶52 The defenses in this case were plainly, mutually antagonistic. Olson contended that the police had arrested the wrong man for the crime and that he was not in the parking lot that night and did not attack the victim. Anthony Marquise Emery Jr. contended that both men were in the parking lot and that he, at least, had consensual sexual relations with the victim. These two defenses are so antagonistic to each other that the jury could easily have returned guilty verdicts, not because the State proved its cases beyond a reasonable doubt, but because the two incredibly different versions presented by the two men, reported to be friends, tainted the credibility of both and invited the jury to infer guilt from that inconsistency alone.

¶53 I concur, however, because while the jury might have unreasonably found both men guilty based on their conflicting defenses alone, Emery and Olson bear the burden of showing specific prejudice on appeal, and neither has met that burden. *See Grisby*, 97 Wn.2d at 507 (citing *State v.*

768

*Kinsey*, 20 Wn. App. 299, 579 P.2d 1347 (1978)). There was overwhelming evidence presented at trial supporting the jury's verdicts. Accordingly, I concur in result.

Reconsideration denied September 10, 2012.