# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. JOHN MARTINEZ, Appellant. | DIVISION ONE No. 84824-1-I UNPUBLISHED OPINION |

DWYER, J. — John Martinez appeals from his conviction of animal cruelty in the first degree. He asserts that the trial court erred by denying a motion for a mistrial based on alleged juror misconduct. Additionally, he contends that the trial court erred by admitting certain evidence in violation of ER 404(b). Martinez furthermore claims that, because he was convicted of a nonviolent felony, his Second Amendment right to bear arms is violated by the restriction on the possession of firearms mandated by RCW 9.41.040 and RCW 9.41.047. While these arguments fail, Martinez is entitled to relief from the legal financial obligations (LFOs) imposed as part of his sentence. Therefore, we affirm the conviction but remand for the trial court to strike the LFOs from the judgment and sentence.

I

John Martinez owned two horses—a mare and her filly. In October 2016, Snohomish County Animal Control (SCAC) received a complaint concerning the

health of the two horses. According to the probable cause affidavit, an SCAC officer visited the horses in the pasture with Martinez and also requested that he arrange for a veterinarian to examine the horses.

In early November 2016, equine veterinarian Dr. Paul Haffner was called to perform a physical examination of the mare. Dr. Haffner determined that the mare had a body score of one[1] on a scale of one to nine, meaning "the ribs are all showing . . . [and] the hip bones are prominent. There's little to no fat, almost no covering to the bones, just enough, basically enough muscle to get around." He also observed the two-year-old filly nursing on the mare. As a result of his examination, Dr. Haffner provided Martinez with a feeding plan and a recommendation to separate the filly and the mare.

An SCAC officer visited the mare again in early December and found her to be "extremely emaciated." The mare appeared to be lethargic and, at one point, laid down on the ground on her side. The officer opined that the mare was extremely weak and cold. The officer also observed the filly attempting to nurse on the mare. The filly was thin as well, with an estimated body score of two.

As a result of his findings, the SCAC officer contacted Martinez and informed him that his mare was in "extremely critical condition," and Martinez needed to act immediately or the horses would be removed. Because Martinez failed to act within the allotted time, SCAC took both horses to its holding facility. The mare's condition deteriorated and she was eventually euthanized.

---

[1] The Henneke body scoring system consists of a one-to-nine scale wherein the body fat of six different parts of the horse is evaluated and averaged. One, the lowest score, means the horse is emaciated. An animal scoring a nine would be extremely obese.

As a result of the poor health and subsequent death of the mare, the State charged Martinez with one count of animal cruelty in the first degree.

Prior to opening statements, Martinez moved to exclude testimony concerning the condition of the filly. Martinez argued that such evidence "falls fairly squarely under [ER] 404(b), in terms of it being another act which [he] is not charged with, which certainly the jury could use to find that he has a propensity towards animal cruelty." The State disagreed that ER 404(b) was applicable to the evidence it intended to present with respect to the filly. The trial court noted that the evidence did not pertain to another wrongful act and was, therefore, not convinced that ER 404(b) applied. As observations related to the filly appeared to have relevance as required by ER 403 and were not unduly prejudicial, the trial court denied the motion to exclude the evidence.

At trial, the State presented testimony from Dr. Haffner as well as several animal control officers. Dr. Haffner testified that he found the mare to be very thin, lethargic, and weak. Upon examination, Dr. Haffner discovered that the mare had significantly worn incisors that hindered her ability to eat green grass. He also observed that the two-year-old filly was nursing on the mare. According to Dr. Haffner, foals are generally weaned somewhere between four and six months of age, "so the foals will grow up on their own and allow the mares to regain their weight back again." He testified that a nursing mare requires "[a]t least half again the normal caloric intake" of food "[b]ecause the energy that is put out through the milk, the nutrients of the milk." Based on his evaluation, Dr. Haffner provided Martinez with a feeding plan for the mare and advised that he

3

separate the nursing filly from the mare "so it's not as – as an energy drain on the mare."

In addition to Dr. Haffner, one of the SCAC officers testified that the filly was nursing on the mare beyond the normal age of weaning. The officer and a second veterinarian both opined on the impact such nursing has on a mare's health. Beyond the evidence that the filly continued to nurse on the mare, the State produced evidence pertaining to the filly alone, such as her weight, including testimony that the filly "wasn't as thin as the sorrel mare. It was still thin . . . I could see that kind of the top line of the filly, the spine area."

Defense counsel raised numerous objections during the course of trial, including, but not limited to, objections based on relevance, hearsay, lack of foundation, narrating, compound question, speculation and that certain testimony was nonresponsive. At one point, outside of the presence of the jury, defense counsel informed the court that Martinez had reported observing several members of the jury sleeping. The court responded that it had been watching the jury and, while no one had been falling asleep, some jurors were expressing visible reactions to defense counsel's objections, such as groaning and closing their eyes. It stated that it would continue to monitor the jury.

On the third day of trial, Martinez moved for a mistrial based on juror misconduct. He argued that the jurors' behavior in response to defense objections—closing their eyes and one juror audibly groaning—demonstrated that they might not be able or willing to abide by the jury instructions directing them not to hold the attorney's objections against the defendant. During its

4

argument on this motion, the defense acknowledged that it "[did not] have authority that specifies this specific sort of occurrence." The court denied the motion, finding that there was no evidence to suggest that the jurors' reactions were an indication that they could not follow the court's instructions.

The jury returned a verdict of guilty on the single count of animal cruelty in the first degree. The trial court sentenced Martinez to a standard range sentence of 30 days of incarceration and imposed $600 in LFOs consisting of a $100 DNA collection fee as mandated by RCW 43.43.7541 and a $500 crime victim penalty assessment (VPA) as mandated by RCW 7.68.035. The judgment and sentence also included the standard, preprinted language that Martinez may not own, use, or possess any firearm pursuant to RCW 9.41.040 and RCW 9.41.047.

Martinez timely appeals.

II

Martinez first asserts that the trial court erred in denying his motion for a mistrial based on juror misconduct. This is so, he avers, because the visible frustration expressed by the jury indicated that it would hold counsel's objections against Martinez such that he could not obtain a fair trial. We disagree.

A

"[A] mistrial may be declared before the verdict based on 'a trial irregularity which significantly infringed on [the defendant's] right to a fair trial.'" State v. Lupastean, 200 Wn.2d 26, 36, 513 P.3d 781 (2022) (alteration in original) (quoting State v. Latham, 100 Wn.2d 59, 62, 667 P.2d 56 (1983)). To determine the effect of a trial irregularity, we examine (1) its seriousness, (2) whether it

5

involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." Emery, 174 Wn.2d at 765. We review a trial court's denial of a motion for a mistrial for an abuse of discretion, meaning that no reasonable judge would have reached the same conclusion. Emery, 174 Wn.2d at 765.

B

As the basis for the mistrial request, Martinez argued that the jurors' reactions proved that the attorney's objections influenced them and they, in turn, would influence other jurors, thus amounting to juror misconduct. Defense counsel engaged in the following exchange during argument on the motion:

> THE COURT: And given I have repeatedly told them to not discuss anything that they have seen or heard here in the courtroom, what evidence do we have to even suggest that they're not following the [c]ourt's instructions?
> [DEFENSE COUNSEL]: I would argue that their very visible reactions, which were visible to Your Honor and the court staff, are evidence that they are not following the instruction that they were given that the objection should not influence them.
> THE COURT: What is it about someone reacting to something that's presented means that they're not following the [c]ourt's instruction?
> [DEFENSE COUNSEL]: I think if they're reacting in a way that is visibly frustrated, they are allowing the objections to influence them.

The court denied the motion for a mistrial, ruling,

> What I have perceived I don't believe in any way is the jurors disregarding the instruction that I have repeatedly given them. Also, the introductory instruction is clear. We just simply have no

> evidence in front of the [c]ourt to suggest even that there is misconduct that has somehow occurred.
>
> Jurors can react however they wish to react. We cannot control that; at least not in this context, what we are talking about here presently. They are clearly instructed in how they are to view the evidence, and I don't have anything more at this point, other than really bare speculation.

Martinez cites no authority for his proposition that the visible reactions from members of the jury in this case amounted to misconduct. As the trial court aptly explained, Martinez premised his motion for a mistrial on mere speculation rather than on any evidence of juror misconduct. The trial court, after swearing in the jury, specifically instructed it on the matter of objections.

> You may hear objections made by the lawyers during trial. Each party has the right to object to questions asked by another lawyer, and may have a duty to do so. These objections should not influence you. Do not make any assumptions or draw any conclusions based on a lawyer's objections.

The jury received the same instruction, once again, prior to its deliberations. Thus, the trial court twice instructed the jury on the very concern raised by Martinez as the basis for his mistrial request. Absent evidence to the contrary, we presume that the jury follows the instructions as given by the court. State v. Kalebaugh, 183 Wn.2d 578, 586, 355 P.3d 253 (2015).

Here, Martinez provided no evidence, in the trial court or on appeal, that the jurors disregarded the trial court's instructions and allowed the attorney's objections to influence them. Further, he offers no express analysis or support as to how the jurors' behavior prejudiced him. Accordingly, Martinez fails to establish that he was "so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." Emery, 174 Wn.2d at 765. Therefore, the

trial court's decision to deny the motion for a mistrial was not an abuse of discretion.

III

Next, Martinez avers that the trial court erred by admitting evidence pertaining to the filly, arguing that such evidence was propensity evidence and unduly prejudicial and, therefore, should have been excluded pursuant to ER 404(b). We disagree. The testimony was properly admissible as res gestae evidence relevant to the crime charged.

A

We review a trial court's ruling to admit or exclude evidence for an abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Taylor, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019). We may affirm the trial court on any ground supported by the record and the law. State v. Mitchell, 190 Wn. App. 919, 924, 361 P.3d 205 (2015).

Martinez moved to exclude the evidence pursuant to ER 404(b), which prohibits the admission of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." However, the trial court, in denying the motion, stated that it was not convinced that the evidence fell under the purview of ER 404(b) because it was "not sure that there is evidence of *another* wrongful act, or an act, I guess, generally, as is called for by 404(b)." (Emphasis added.) The trial court was correct in its assessment that

ER 404(b) was not applicable to the evidence at issue. Rather than evidence of other misconduct, testimony concerning the filly is properly conceived of as "res gestae" or "same transaction" evidence.

B

Testimony may be admissible as res gestae evidence "'if it is so connected in time, place, circumstances, or means employed that proof of such other misconduct is necessary for a complete description of the crime charged, or constitutes proof of the history of the crime charged.'" State v. Schaffer, 63 Wn. App. 761, 769, 822 P.2d 292 (1991) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 115, at 398 (3d ed.1989)), aff'd, 120 Wn.2d 616, 845 P.2d 281 (1993). Such evidence is admissible "in order that a complete picture be depicted for the jury." State v. Tharp, 96 Wn.2d 591, 594, 637 P.2d 961 (1981). Res gestae evidence "completes the story of the crime charged or provides immediate context for events close in both time and place to that crime." State v. Sullivan, 18 Wn. App. 2d 225, 237, 491 P.3d 176 (2021).

Here, rather than describing other conduct, much of the State's evidence pertaining to the filly established that it was nursing on the mare that Martinez was charged with abusing. The State's opening statement first raised the issue of the filly in this context:

> Dr. Haffner also noticed that there was a second horse on the property, a filly, which in English is a younger horse, and that filly was still nursing on the sorrel mare. And this was far too long that this filly should have been nursing. He also told the defendant to remove the nursing foal.

As discussed above, Dr. Haffner stated that he observed an approximately two-year-old filly that was still nursing on the mare, around a year and a half beyond what he would consider typical nursing age.  He further explained that a nursing filly requires extra caloric intake for the mare.  Other witnesses provided similar testimony as to the impact that the nursing filly would have on the mare's health and nutritional needs.

The evidence of the filly nursing on the mare was integral to the State's explanation of the mare's condition and was, therefore, directly relevant to the animal cruelty charge that Martinez faced at trial.  Thus, the evidence was material to an element of the crime charged, rather than evidence of other misconduct.  See Sullivan, 18 Wn. App. 2d at 240.  The testimony describing the prolonged nursing and related nutritional impact on the mare provided relevant context and completed the story of the crime charged.

While seemingly unrelated to the condition of the mare, the evidence regarding the filly's weight was also pertinent to the context of the animal cruelty charge.  One animal control officer testified that when called to investigate, he considers different possibilities when only one of a group of horses appears thin as opposed to when several or all horses appear thin.  If more than one horse is affected, the cause is more likely to be something such as the amount and quality of the feed provided.  That both the filly and the mare were affected is not evidence of a separate crime but, rather, is integral to the full story of Martinez's treatment of the mare.  This was evidence not of another act, but of the very charge before the jury.

Accordingly, the evidence pertaining to the filly was properly admissible under the theory of res gestae. The trial court's decision to admit the evidence was not an abuse of discretion.

IV

Martinez next asserts that the restriction on his right to possess a firearm resulting from his conviction violates the right to bear arms guaranteed by the Second Amendment. This is so, Martinez avers, because deprivation of his right to possess a firearm after conviction for a nonviolent felony is not consistent with the historical tradition of firearm regulation in this country. We disagree and adhere to the reasoning in State v. Ross, 28 Wn. App. 2d 644, 537 P.3d 1114 (2023), review denied, 2 Wn.3d 1026 (2024), and State v. Bonaparte, __ Wn. App. 2d __, 554 P.3d 1245 (2024), in which this court addressed and rejected the very argument raised by Martinez.

We review constitutional challenges de novo. City of Seattle v. Evans, 184 Wn.2d 856, 861, 366 P.3d 906 (2015). We presume constitutionality, and the burden is on the challenger to show that a statute is unconstitutional. Evans, 184 Wn.2d at 861-62. An as-applied challenge, such as the one asserted here by Martinez, requires examination of the statute in the specific circumstances of the case. Ross, 28 Wn. App. 2d at 646. "Holding a statute unconstitutional as applied does not invalidate the statute but prohibits its application in that specific context and future similar contexts." Ross, 28 Wn. App. 2d at 646.

The Second Amendment to the United States Constitution, which has been incorporated to the states, declares that "[a] well regulated militia being

11

necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend II. See McDonald v. City of Chicago, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010); State v. Sieyes, 168 Wn.2d 276, 282, 225 P.3d 995 (2010). However, the right to bear arms is not without limits, which include "longstanding prohibitions on the possession of firearms by felons." District of Columbia v. Heller, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008); see, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 34, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022); McDonald, 561 U.S. at 786; State v. Krzeszowski, 106 Wn. App. 638, 641, 24 P.3d 485 (2001).

In Ross, we traced recent jurisprudence from the United States Supreme Court on the constitutionality of certain restrictions on the possession of firearms. 28 Wn. App. 2d at 647-50. We noted that, in Heller, the Supreme Court recognized and affirmed restrictions on firearm possession by felons by explicitly stating that "'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" Ross, 28 Wn. App. 2d at 647 (quoting Heller, 554 U.S. at 626-27). Two years after Heller, the Supreme Court acknowledged that, "[w]e made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons,'" and "repeat[ed] those assurances." McDonald, 561 U.S. at 785 (plurality opinion) (citation omitted) (quoting Heller, 554 U.S. at 626-627).

Subsequently, New York State Rifle considered a regulatory licensing program that required applicants to prove "proper cause" in order to carry a handgun in public. 597 U.S. at 11-13. Based on the language used in that decision, we concluded that the Supreme Court continued to support the longstanding restrictions on possession of firearms by felons:

> Relevant here, N.Y. State Rifle did not overrule, or cast doubt on, the Court's recognition in Heller and McDonald that the Second Amendment did not preclude prohibitions on felons possessing firearms. The six-justice majority opinion fully embraced the earlier decisions in Heller and McDonald that the Second and Fourteenth Amendments protect the right of "ordinary, *law-abiding* citizens to possess a handgun in the home for self-defense." Indeed, at least 11 times the majority referenced the Second Amendment right of "law-abiding" citizens.

Ross, 28 Wn. App. 2d at 649 (citation omitted). Accordingly, we held "that consistent with Heller, McDonald, and New York State Rifle, the Second Amendment does not bar the State from prohibiting the possession of firearms by felons as it has done in RCW 9.41.040(1)." Ross, 28 Wn. App. 2d at 651. Further, Ross applied its consideration of these cases to the constitutionality of prohibiting nonviolent felons from possessing firearms, and noted that none of the pertinent Supreme Court cases distinguishes between violent felons and nonviolent felons for the purpose of the Second Amendment. We stated that "Ross's attempt to distinguish violent and nonviolent felons is of his own construct," and declined to make such a distinction. Ross, 28 Wn. App. 2d at 651. Thus, we held that the constitutional challenge to the firearm restrictions as applied to nonviolent felons failed. Ross, 28 Wn. App. 2d at 652-53.

13

This court revisited the constitutionality of firearm restrictions on felons in Bonaparte, wherein the defendant argued that the State must prove a "historical tradition of depriving a person of the right to possess a firearm based on a prior conviction for assault in the first degree" for such restrictions to be constitutional under the Second Amendment. 554 P.3d at 1247. Once again, we examined the Second Amendment jurisprudence from Heller, McDonald, and New York State Rifle, after which we turned our consideration to United States v. Rahimi, 602 U.S. __, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024), a decision on the Second Amendment recently issued by the United States Supreme Court. Bonaparte, 554 P.3d at 1248-49. Rahimi addressed a federal statute that prohibits the subject of a domestic violence restraining order from possessing a firearm. 144 S. Ct. at 1894. Despite the context of a restraining order rather than a felony conviction, Rahimi reiterated that prohibitions on the possession of firearms by felons are presumptively lawful. 144 S. Ct. at 1902; Bonaparte, 554 P.3d at 1249. Accordingly, Bonaparte emphasized the Supreme Court's "repeated articulation that prohibitions on the possession of firearms by felons are presumptively lawful or more general language that the Second Amendment right to keep and bear arms is 'not unlimited.'" 554 P.3d at 1251 (quoting Heller, 554 U.S. at 595).

After tracing Second Amendment jurisprudence through the most recent cases, Bonaparte considered the as-applied challenge to firearm restrictions on those with prior convictions for assault in the first degree. 554 P.3d at 1251-52. As with the violent versus nonviolent felony distinction, the attempt to distinguish

"people with prior assault convictions" was of the defendant's "own construct" and "is of no moment." Bonaparte, 554 P.3d at 1251. Historical tradition supports such restrictions where the defendant is a *felon*.

Restrictions on firearm possession by a felon, regardless of whether the crime of conviction was violent or nonviolent, do not violate the rights guaranteed by the Second Amendment. As a result of his conviction, Martinez is a felon, and thus, his as-applied challenge to the restrictions fails.

V

Finally, Martinez requests that we direct the trial court to strike the LFOs from his judgment and sentence pursuant to legislation enacted subsequent to his sentencing. The legislative amendments require waiver of the VPA and the DNA collection fee for indigent defendants. RCW 7.68.035; RCW 43.43.7541.[2] As a defendant in a case pending on direct appeal, Martinez is entitled to the benefit of legislative changes. State v. Ramirez, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

The trial court found that Martinez was indigent. Furthermore, the State concedes that the LFOs should be struck from the judgment and sentence. Accordingly, we remand to the trial court solely for that purpose.

Affirmed in part and remanded.

_Dwyer, J._

---

[2] See LAWS OF 2023, ch. 449, §§ 1, 4.

WE CONCUR:

Díaz, J.     Chung, J.