FILED
COURT OF APPEALS
DIVISION II

2014 JUN 24 AM 9: 05

STATE OF WASHINGTON
BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44268-0-II |
| Respondent, | |
| v. | |
| ROY EUGENE MILLER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — A jury convicted Roy Eugene Miller of second degree assault with a deadly weapon enhancement, a firearm enhancement, and a domestic violence enhancement. The jury also convicted Miller of possession of a dangerous weapon. Miller appeals arguing that (1) the trial court improperly excluded evidence that the victim was a drug dealer, (2) the prosecutor committed misconduct, and (3) he received ineffective assistance of counsel. We affirm Miller's convictions.

## FACTS

Miller and Rachel Robinson lived together for several years and have a son in common. After their relationship ended, Robinson moved out of the house and their son continued to live with Miller. But, Robinson went to Miller's house almost every day to see her son. On July 13, 2012, Robinson was at Miller's house. She put her son to bed and made plans to come and pick him up the next afternoon. The next morning, Robinson received a text message from Miller stating that if she came to the house she would leave in an ambulance. In the late afternoon,

Robinson went to the house to pick up her son as planned. She went into the yard and began picking berries while she waited to see if her son would come out to meet her.

After a few minutes, Miller came running out toward her holding a large pipe. When Robinson saw Miller, she opened the pocketknife she was carrying and swung it at Miller causing a superficial cut on his arm. Miller hit Robinson three times with the pipe: once on her left hand, once on her left hip, and once across her shoulder blade. After Miller hit Robinson on the shoulder blade, she fell onto the ground. Then Miller pulled a gun from his waistband, and pointed it at Robinson. Miller stated, "I should just finish you off now," stomped on Robinson's ribcage and left her lying on the ground. 1A Report of Proceedings (RP) at 62.

Miller's neighbor heard the argument. When he heard a male voice yell, "Die, bitch," he called the police. 1A RP at 47. Kalama Police Officer Jeff Skeie and Sergeant Stephen Parker responded to the call. When Skeie arrived on the scene, he secured several weapons in Miller's immediate possession: the gun, an illegal spring blade knife, a pocket knife, and a "Leatherman" knife tool. 1A RP at 134. After speaking with Miller and Robinson, Parker arrested Miller.

The State charged Miller with second degree assault with a firearm enhancement and a deadly weapon enhancement. The State also charged Miller with unlawful possession of a dangerous weapon. Prior to trial, the State moved to exclude evidence related to Robinson using or selling drugs. Miller argued that the evidence was relevant because it explained why he did not want Robinson in the house and why he had a gun. The trial court made the following ruling:

2

I can see where, potentially, this is relevant in a very narrow perspective of his belief that she's involved in an illegal activity. Uh, and that—so that it doesn't cast dispurgeon [sic] on him of, as you say of why he would not want her there. The problem is, now we're looking at this great big open door to, you know, was she really doing it or not? And, that's where I'm having some real problems with going down this path of trying a case about a drug deal because that's not what we're here for. Uh, it's about an assault that took place, and, if – if there's some way to fashion this in a very narrow—um—restricted manner that that was his belief, then I could see where that—I, you know, may be willing to allow that. But, anything else that starts opening this great big door, you know, if that's his belief and that's what he told her and that's why he told her, then it could be for a very limited purpose. So—

. . . .

All right. I will—I do find there is at least some relevance, although very limited, and, you know, essentially we're going to have to see how this evolves. But, if this starts evolving into a trial about a drug deal, I'm going to stop it right there, because that's going down the road that's not relevant. That's a separate action that is not at the heart of this case. Uh, and, as long as it continues to be tied in and we're not opening, as I said, this door to try a separate incident I will allow it. But, it—it's going to have to be kept very narrow, and if it's not then I expect the objections and I will rule on it at that time. Okay.

1A RP at 27, 30. During trial, Miller did not attempt to introduce any evidence about Robinson doing or selling drugs.

At trial, Robinson testified to the facts stated above. She also explained that she went to the house, even after Miller told her not to, because he would often send her angry messages but be fine by the time she arrived at the house to see her son. She also stated that she brought the knife with her for her own protection. During cross-examination, Robinson testified that Miller had assaulted her in the past.

Miller testified to support his claim of self-defense and lawful use of force. Generally, Miller's account of the incident was similar to Robinson's. He agreed that she was in the backyard eating berries when he first saw her. But, Miller testified that he did not pick up the

3

pipe until he was outside, and he did not raise or swing the pipe until after Robinson attacked him with the knife. Miller testified that Robinson tried to stab him with the knife several times and each time he responded with the pipe to keep her from stabbing or cutting him. He also testified that he never threatened Robinson with the gun. Rather, he testified that during the struggle with Robinson, the gun fell out of his waistband. When the gun hit the ground, a round jammed in the chamber. While he was trying to clear the gun, Robinson began to get up, so Miller put his foot on her shoulder, pushed her back down, and told her to stay on the ground.

The jury found Miller guilty of second degree assault and possession of a dangerous weapon. The jury also entered three special verdict forms finding: (1) Miller was armed with a firearm, (2) Miller was armed with a deadly weapon (the pipe), and (3) Miller and Robinson were household or family members. Miller appeals.

## ANALYSIS

### A. EXCLUSION OF EVIDENCE

Miller argues that the trial court erred by excluding evidence of Robinson's drug use. Miller's argument is frivolous. The trial court did not exclude all evidence that Robinson was involved in doing or selling drugs. Rather, the trial court ruled that any evidence would be limited to evidence that was relevant to the issues in the case. And, the trial court was clear that it would not permit Miller to turn the trial into a trial about whether Robinson actually did or sold drugs. However, these ruling did not preclude Miller from asking Robinson directly about her alleged drug use, or from presenting evidence to impeach her if she denied it. Further, the ruling did not exclude Miller from testifying about his personal knowledge about Robinson's involvement in doing or selling drugs and how that related to his beliefs and actions at the time

of the incident. Accordingly, the trial court did not exclude evidence that prevented Miller from presenting his defense and Miller's argument fails.[1]

B. PROSECUTORIAL MISCONDUCT

Miller argues that the prosecutor committed misconduct by introducing improper opinion testimony during its redirect examination of Sergeant Parker. Miller did not object to the question or answer. Here, he has failed to meet the high burden imposed when a defendant fails to object to alleged prosecutorial misconduct.

To prevail on a prosecutorial misconduct claim, a defendant must show that the prosecutor's conduct was improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To show prejudice, a defendant must show a substantial likelihood that the misconduct affected the verdict. *Thorgerson*, 172 Wn.2d at 442-43. A defendant who fails to object to the prosecutor's improper act at trial waives any error, unless the act was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Thorgerson*, 172 Wn.2d at 443. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remark. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012).

---

[1] In his issue statement, Miller also asserts that the trial court erred "when it refused to allow the defense to elicit the fact that the complaining witness had not told the police that the defendant had threatened her with a gun." Br. of Appellant at 1. However, Miller fails to support this assertion with any argument or authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (we do not consider issues that are unsupported by citation to argument or authority). We do not address the issue any further.

No. 44268-0-II

Here, Miller points to one specific incident of alleged prosecutorial misconduct that occurred during the prosecutor's redirect examination of Sergeant Parker:

[STATE]: Um, why didn't you arrest Rachel Robinson?
[PARKER]: Well, as far as the assault, we didn't believe that she was the primary physical aggressor.

1A RP at 193. Miller argues that the prosecutor's question was improper because it elicited inadmissible opinion testimony. Even assuming, without deciding, that the question was improper, Miller has failed to meet his burden to show prejudice.

If Miller had objected, the jury could have been instructed to disregard Sergeant Parker's answer. We assume that juries will follow the court's instructions. *State v. Weber*, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). Therefore, if the jury had been instructed to disregard Parker's opinion that Robinson was not the primary aggressor, any prejudice from the comment would have been cured. Because a jury instruction could have cured the prejudice, Miller has failed to meet his burden to prove prosecutorial misconduct.

C. INEFFECTIVE ASSISTANCE OF COUNSEL

We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.

6

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To rebut this presumption, a defendant bears the burden of establishing the absence of any legitimate trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Here, Miller cannot meet his burden to show the absence of any legitimate trial tactic explaining defense counsel's decision not to ask the trial court to strike Robinson's references to prior abuse by the defendant.

Miller asserts that he received ineffective assistance of counsel because his defense counsel did not ask the trial court to instruct the jury to disregard several of Robinson's nonresponsive answers regarding prior assaults by the defendant. Specifically, he argues that Robinson's comments were inadmissible propensity evidence. However, as the State correctly points out, the question currently before this court is not whether Robinson's statements were admissible under ER 404(b), but rather whether Miller can meet his burden to show ineffective assistance of counsel on appeal.

During Miller's cross-examination of Robinson, the following four exchanges took place:

[DEFENSE]: So, why do you think you needed a knife that time?
[ROBINSON]: Because me and him got in fights. I know how he is. I've put up with him hitting me upside the head and my ear bleeding. I mean, he's pulled his gun on me in front of our son. This is just him, I mean, he's—and yeah, I've fought back previous times, too. And this time I felt a little bit better and he also was telling me that he was getting—giving my stuff away. Giving my car key away, my spare car key, and the X-Box, the Wii, he said he was, you know, giving—getting rid of all my stuff. Giving it away to someone who despises me. And I have no idea who that was.
[DEFENSE]: And so you took the knife there to stab him?
. . . .

[DEFENSE]: You said you hadn't really paid attention to that gun before?
[ROBINSON]: Oh, I got it pulled on me so many times, it's not that I don't pay attention to it. I kind of got used to him pulling a gun on me.

. . . .

[DEFENSE]: Are you aware that he has some physical limitations?
[ROBINSON]: What do you mean by that? Physical limitations?
[DEFENSE]: Bad back, a bad left arm?
[ROBINSON]: Yeah, that's never stopped him before from beating on me.
[DEFENSE]: Okay, that wasn't really my question. My question was you're aware that he has the bad back?

. . . .

[DEFENSE]: You weren't trying to set [Miller] up were you?
[ROBINSON]: No, I wasn't. I've never done that. If that was the case, I would have done it a long time ago. All the twenty, thirty other times he's beat on me. That was not my intention—I did not. The neighbors called that I don't talk to, I don't talk to his neighbors. I wanted to get arrested because I was afraid of [Miller], the way he would react, I mean, and I asked Officer Skeie, who—you know, who called the cops? And he said the neighbor.

1A RP at 86, 88, 93, 95.

Miller's defense was primarily that Robinson was the primary physical aggressor and that he acted in self-defense. Miller also argued that Robinson set him up to get him arrested. Robinson's answers during cross-examination could actually support Miller's theories. For example, Miller implied that it was not plausible that Robinson would have gone to Miller's house if she was legitimately afraid of being assaulted, and therefore, she went there to attack Miller. Further, if Miller had repeatedly assaulted her, she would have a motive to set him up and get him arrested. There are legitimate trial tactics that explain defense counsel's performance in this case. Because Miller has failed to show the absence of any legitimate trial tactic, he cannot show his defense counsel's performance was deficient, and his ineffective assistance of counsel claim must fail.

8

No. 44268-0-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Hunt, J.

_____
Bjorgen, A.C.J.

9