FILED
COURT OF APPEALS
DIVISION II

2014 NOV 13 AM 8: 59

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44741-0-II |
| Respondent, | |
| v. | |
| JOSE MOISES SEGOVIA-BARRERA, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Jose M. Segovia-Barrera appeals his conviction for first degree child molestation, arguing that (1) the trial court erred in admitting the victim's hearsay statements, (2) the prosecuting attorney committed misconduct during closing argument, and (3) the trial court erred in imposing discretionary legal financial obligations. We hold that the trial court properly evaluated the reliability of the victim's statements on the basis of the evidence introduced during the child hearsay hearing. We also hold that the prosecuting attorney did not commit misconduct in responding to defense counsel's closing argument during her rebuttal argument. We accept the State's concession of error concerning the imposition of a fee for crime lab testing but hold that the trial court did not abuse its discretion in imposing a fee for court-appointed counsel. We affirm the conviction and remand for the trial court to strike the crime lab fee from the judgment and sentence.

No. 44741-0-II

## FACTS

After Stephanie Hahn and Segovia-Barrera began a romantic relationship in 2006, Hahn gave birth to their daughter, B.S.,[1] in 2007. Hahn and Segovia-Barrera married on June 10, 2012, so that he would not be deported. Segovia-Barrera moved out a few days later to stay with Hahn's mother. Hahn took B.S. to see Segovia-Barrera every weekend.

After Segovia-Barrera left, B.S. became angry and started acting out. One day, while Hahn and B.S. were watching television, Hahn saw B.S. "humping on something." 2 Report of Proceedings (RP) at 164. When Hahn asked B.S. what she was doing, B.S. pulled a nail polish bottle away from her crotch. B.S. said she did not want to tell and that "daddy showed her and that [Hahn will] be mad at her." 2 RP at 164. Hahn told B.S. that the behavior was not okay and dropped the subject because B.S. seemed embarrassed.

B.S. told Hahn later that day that Segovia-Barrera had sat on her grandmother's couch with her and "[s]he did like a humping movement, and she said that it hurt and that it puked on her and it looked like milk." 2 RP at 165. Hahn reported these statements to Child Protective Services and the police.

Segovia-Barrera was not immediately arrested, and Hahn's boyfriend, James Griffin, did not feel that Hahn and her children were being adequately protected. During a confrontation between the two men, Griffin sprayed Segovia-Barrera with pepper spray and cut his throat with a razor blade. Griffin then fled to California, and Hahn followed. When they returned to Washington, Hahn told the police that she, rather than Griffin, had assaulted Segovia-Barrera. She

---

[1] Pursuant to General Order 2011-1, this opinion refers to the juvenile victim by initials to protect the minor's privacy interests.

later admitted that B.S.'s statements about Griffin assaulting Segovia-Barrera, which contradicted Hahn's statements and implicated Griffin, were correct.

After Segovia-Barrera's arrest for the alleged abuse of B.S., the State charged him by amended information with first degree child molestation and alleged that he used his position of trust to facilitate the offense. The court held a hearing to determine five-year-old B.S.'s competency to testify, as well as the admissibility of her hearsay statements about the abuse to Hahn and several others. B.S. testified that Segovia-Barrera touched her "[w]here we go potty at" with what "he goes potty at" on her grandmother's couch. 1 RP at 17. She said that it felt "like milk and like puke," and that Segovia-Barrera cleaned it up with a towel. 1 RP at 17. She added that even though he told her not to tell her mother, she told Hahn about the incident.

Hahn testified about seeing B.S. rubbing herself against the bottle of nail polish and about B.S.'s disclosures concerning Segovia-Barrera's abuse. Hahn added that B.S. never made any contradictory statements. B.S.'s grandmother, two aunts, and a family friend testified that B.S. volunteered statements about the abuse to them. Detective Edward McGowan described a taped forensic interview with B.S. in which she described the touching consistently with what she had told others.

The State argued that this testimony showed that B.S. was competent to testify and that her statements were reliable. Defense counsel addressed the reliability issue by responding only that it seemed odd that each witness made "spontaneous" statements that were "almost verbatim." 1 RP at 66. The trial court concluded that B.S. was competent to testify and that her hearsay statements were reliable. The court entered written findings of fact and conclusions of law to support its ruling.

At trial, B.S. testified about the incident, and her family members and friend testified about her statements describing the abuse. The State played the video of B.S.'s forensic interview to the jury, and a nurse practitioner who examined B.S. also described the child's disclosures. She added that her physical examination of B.S.'s condition could be consistent with abuse. Two police officers testified for the defense about interviews with Segovia-Barrera and Hahn concerning Griffin's assault.

The jury found Segovia-Barrera guilty as charged and also found, by special verdict, that he used his position of trust to facilitate the offense. At sentencing, Segovia-Barrera asked the court to impose a standard range sentence and to waive all fines and costs "because he will not ever be able to pay anything." 2 RP at 289. The trial court accepted the recommendations of the State and the Department of Corrections and imposed an exceptional sentence of 120 months to life. The court also imposed $1,400 in legal financial obligations that included a $500 fee for court-appointed counsel and a $100 crime lab fee.

Segovia-Barrera appeals his conviction. He also appeals the trial court's imposition of court-appointed counsel and crime lab fees.

## ANALYSIS

### A. ADMISSIBILITY OF CHILD HEARSAY

Segovia-Barrera challenges the trial court's decision that B.S.'s hearsay statements satisfied the reliability requirement in the child hearsay statute, RCW 9A.44.120. This statute provides for the admission of hearsay statements when the declarants are victims of sexual abuse under the age of 10. *State v. Woods*, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005). Hearsay is admissible under the statute if:

> (1) The court finds . . . that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
>
> (2) The child either:
>> (a)    Testifies at the proceedings; or
>> (b)    Is unavailable as a witness: PROVIDED, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

RCW 9A.44.120. Appellate courts will not reverse a finding that statements meet these statutory criteria absent an abuse of discretion. *Woods*, 154 Wn.2d at 623. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable reasons or grounds. *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006).

To assess the reliability of child hearsay statements, Washington courts apply the nine *Ryan* factors. *State v. Swan*, 114 Wn.2d 613, 647-48, 790 P.2d 610 (1990) (citing *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984)), *cert. denied*, 498 U.S. 1046 (1991). The nine factors are: (1) whether the child had an apparent motive to lie, (2) the child's general character, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) whether trustworthiness was suggested by the timing of the statement and the relationship between the child and the witness, (6) whether the statements contained express assertions of past fact, (7) whether the child's lack of knowledge could be established by cross-examination, (8) the remoteness of the possibility that the child's recollection was faulty, and (9) whether the surrounding circumstances suggested the child misrepresented the defendant's involvement. *Woods*, 154 Wn.2d at 623 (citing *Ryan*, 103 Wn.2d at 175-76). Every factor does not need to be satisfied; it is enough that they are substantially met. *Woods*, 154 Wn.2d at 623-24.

Segovia-Barrera argues on appeal that the trial court did not apply all the *Ryan* factors and disregarded B.S.'s motive to lie by basing its decision to admit the child hearsay "largely" on only

four findings, i.e., that B.S. understood her obligation to tell the truth, that she had the mental capacity to receive an accurate impression of the alleged abuse, that she had sufficient memory, and that she presented as bright and articulate. Br. of Appellant at 6. These findings addressed B.S.'s competency rather than the reliability of her hearsay statements, however, and they reflected the factors to determine competency set forth in *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

The trial court addressed the *Ryan* factors after finding B.S. competent to testify and after describing her disclosures to family, friends, and law enforcement. The trial court made the following findings of fact:

32.

B.S. has no motive to lie about the sexual abuse.

33.
There is nothing in the general character of B.S. which indicates a propensity to lie.

34.

More than one person heard B.S.'s statements and B. S.[']s statements remained consistent during her disclosures . . . .

35.

B. S.'s statements were spontaneous. There was nothing leading or suggestive by any of the adults to whom B.S. spoke which would suggest the statements were anything other than spontaneous.

36.

There is nothing in the relationship between B.S. and the people to whom she disclosed that indicates any sort of untrustworthiness concerning the statements.

37.

B.S.'s disclosures contained express assertions of the sexual assault.

38.

The court finds no evidence that B.S.[']s recollection of the events is
faulty and her testimony was not exaggerated or over amplified.

Clerk's Papers (CP) at 36. These findings show that the trial court properly based its decision

concerning the reliability and admissibility of B.S.'s hearsay statements on the *Ryan* factors.

Segovia-Barrera also argues that the trial court failed to consider evidence showing that

B.S. had a clear motive to lie. Segovia-Barrera asserts that her motive to lie was apparent from

the circumstances surrounding his relationship with Hahn, Hahn's relationship with Griffin, and

Hahn's admission that she coached B.S. to lie. This argument overlooks the fact that this evidence

was not introduced during the child hearsay hearing. This argument also misrepresents the

evidence regarding Hahn's alleged coaching, which unfolded as follows.

The defense revealed in a trial brief filed more than a month after the child hearsay hearing

that Segovia-Barrera believed Hahn had coached B.S. into accusing him of sexual abuse so that

she could get him out of her life and be with Griffin. However, the record does not support

Segovia-Barrera's claim. The only reference in the record with regard to B.S. being coached was

made in relation to B.S.'s statements about Griffin's assault on Segovia-Barrera.[2] Thus, contrary

---

[2] In an offer of proof, an officer explained that the reference to coaching came when he questioned
Hahn about her statement regarding the assault on Segovia-Barrera and how it conflicted with
B.S.'s description:

> I asked her if she was telling me that [B.S.] was lying and her reply was that what
> [B.S.] had apparently reported was not true and she believes someone else may
> have coached [B.S.] to say that.
>
> . . . .

to Segovia-Barrera's current assertion that Hahn admitted to coaching B.S. about the sexual abuse disclosures, there was no such admission. Rather, any reference to B.S. being coached was made in the context of Griffin's assault on Segovia-Barrera.

Segovia-Barrera also complains that the trial court failed to consider the suspicious timing of B.S.'s disclosures, as shown by the fact the disclosures came only after her parents separated. The trial testimony revealed that Segovia-Barrera and Hahn had a troubled relationship and that they married only to prevent his deportation. When they separated a few days later, Segovia-Barrera went to stay with B.S.'s grandmother, which was where the abuse allegedly occurred. We see nothing suspicious about the timing of B.S.'s subsequent disclosures.

Based on the evidence introduced at the child hearsay hearing, the trial court properly found that B.S. had no motive to lie, that there was nothing to suggest that her spontaneous and consistent statements to several adults were not trustworthy, and that no evidence showed that her memory was faulty or that her testimony was exaggerated. Even if the additional evidence introduced at trial is somehow relevant to the trial court's pretrial ruling, it does not undermine the court's findings regarding the reliability of B.S.'s statements. We see no abuse of discretion in the trial court's determination that B.S.'s hearsay statements about the sexual abuse were reliable.

---

. . . I told her that [B.S.] had told us that [Hahn] stayed in the car while Griffin had been the one to go in the yard. Ms. Hahn said that wasn't right, she had already told me what had happened. . . She said that what [B.S.] described had not happened, someone must have coached her to tell that story.

2 RP at 251, 252-53. The trial court declined to admit this explanation or further testimony about coaching because it pertained to the assault and not to the alleged sexual abuse.

B. PROSECUTORIAL MISCONDUCT

Segovia-Barrera next argues that the prosecuting attorney committed prejudicial misconduct during closing argument when she "repeatedly instructed" the jurors to consider what they would do if B.S. were their child and urged them to put themselves in her shoes. Br. of Appellant at 4.

A defendant who alleges prosecutorial misconduct during closing argument first must establish that the statements were improper. *State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). Once a defendant establishes that a prosecutor's statements were improper, we must determine whether the defendant was prejudiced. *Emery*, 174 Wn.2d at 760. If the defendant did not object at trial, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61.

During closing argument, a prosecuting attorney has wide latitude to argue reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Remarks made in response to defense arguments are not improper as long as they do not go beyond what is necessary to respond to the defense. *State v. Dykstra*, 127 Wn. App. 1, 8, 110 P.3d 758 (2005), *review denied*, 156 Wn.2d 1004 (2006). We review allegedly improper remarks in the context of the entire argument. *State v. Gregory*, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006), *overruled on other grounds*, State *v. W.R., Jr.*, ___ P.3d ____, No. 88341-6, 2014 WL 5490399 (Wash. Oct 30, 2014).

The statements at issue occurred during the State's rebuttal argument. The State was responding to defense counsel's argument about Griffin's assault and Hahn's decision to join

No. 44741-0-II

Griffin in California, and how those facts supported the defense theory that B.S. was coached. The State's rebuttal included a single reference to what the jurors would do if B.S. were their child and a single reference to the jurors putting themselves in her shoes. These statements, in context, are as follows:

> You know the assault on Mr. Segovia is—is unfortunate and it is not something that is condoned under the law to take the law into your own hands. But what does that tell you? **What do most people say if you start talking about what they would do if somebody hurt their kid.** And why would the mother go to California? Well, you know, she—she didn't necessarily make the best decisions here, but the kids were in a safe place. She was worried about what was going [to] happen with this other case, and then she went to the police and she made this false confession because she didn't want to see her friend turned boyfriend go to prison for standing up for her daughter. . . .
> We are not here to decide whether or not Ms. Hahn made good decisions in this case. That is obviously being dealt with in another situation. What you're here to decide is do you believe [B.S.]. And do you believe the things that she has said over and over again. Does that—the child that sat here and testified to you, does she seem coached? Five years old. **And you can put yourself in her shoes, how you would feel as adults taking that seat in front of strangers and talking about something that personal.** You judge her credibility.

2 RP at 272-73 (emphasis added).

The comments highlighted above were a reasonable response to defense counsel's argument. These comments neither exceeded what was necessary to make that response nor constituted an improper appeal to the jury's passions or prejudices. Because there was no misconduct, we need not address the issue of prejudice.

C. LEGAL FINANCIAL OBLIGATIONS

Segovia-Barrera argues that the trial court erred in imposing discretionary legal financial obligations (LFOs) without considering his ability to pay. The obligations he challenges are the $500 fee for court-appointed counsel and the $100 crime lab fee. We review a trial court's decision to impose discretionary LFOs under the clearly erroneous standard. *State v. Calvin*, 176 Wn. App.

10

1, 302 P.3d 509, 316 P.3d 496, 508 n.1 (2013). Clear error exists when a review of the record leads to a definite conviction that a mistake was committed. *Calvin*, 316 P.3d at 508 n.1 (quoting *Schryvers v. Coulee Cmty. Hosp.*, 138 Wn. App. 648, 654, 158 P.3d 113 (2007)).

Under RCW 10.01.160(3), "[t]he court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." Section 2.5 of Segovia-Barrera's judgment and sentence cited RCW 10.01.160 in stating that "[t]he court has considered the total amount owing[,] the defendant's present and future ability to pay legal financial obligations[,] including the defendant's financial resources[,] and the likelihood that the defendant's status will change."[3] CP at 60.

The trial court imposed the challenged fees after Segovia-Barrera asked for a waiver of all LFOs because he would never be able to pay them. He provided no support for his assertion, however, and the record shows that he has been employed in the past and has been able to pay some child support and other court costs. Consequently, the record does not show that the trial court's imposition of a $500 fee for court-appointed counsel was clearly erroneous.

The trial court also imposed a crime lab fee. *See* RCW 43.43.690(1) (when a person has been convicted of a crime and a state crime laboratory analysis was performed, the court shall levy

---

[3] Segovia-Barrera contends that the trial court failed to check the box in his judgment and sentence stating that it had considered his ability to pay LFOs, but this contention is not accurate. The unchecked boxes relate to additional specific findings concerning restitution, incarceration costs, and emergency response costs.

No. 44741-0-II

a fee of $100). However, no crime lab analysis was completed. Therefore, we accept the State's concession of error regarding the crime lab fee.

Accordingly, we affirm the defendant's conviction and the imposition of the fee for court-appointed counsel. We remand so that the trial court can strike the crime lab fee from the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Sutton, J.

12