FILED
COURT OF APPEALS
DIVISION II

2015 JUL 21 AM 9: 26

STATE OF WASHINGTON

DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In Re The Personal Restraint of | No. 45163-8-II |
| SHAMARR PARKER, | |
| Petitioner. | UNPUBLISHED OPINION |

SUTTON, J. – In this personal restraint petition (PRP), Shamarr Derrick Parker seeks relief from restraint imposed following his 2010 jury trial convictions for first degree kidnapping and first degree robbery. He argues that the State engaged in prosecutorial misconduct on several grounds and that the trial court erred in admitting certain testimony. He further argues that he received ineffective assistance of appellate counsel because his counsel failed to raise these issues on direct appeal. We hold that Parker's appellate counsel provided ineffective assistance of appellate counsel in failing to raise the prosecutorial misconduct claim based on the State's appeal to the jury's passion and prejudice. Accordingly, we grant this petition, reverse the convictions, and remand to the superior court for further proceedings. We decline to address the remaining issues.

No. 45163-8

## FACTS

### I. BACKGROUND FACTS

On December 19, 2008, T.M.[1] called 911 and reported that her 17-year-old daughter A.W.[2] had been raped at knifepoint. The State charged Parker by second amended information with first degree kidnapping while armed with a deadly weapon, first degree rape while armed with a deadly weapon, and first degree robbery while armed with a deadly weapon.

We summarized the trial testimony in Parker's direct appeal:

> A.W. testified that she was waiting for a Tacoma bus to take her home when a brown car drove by. A heavy snow had fallen that day. Parker, the driver of the brown car, asked A.W. if she wanted a ride and pulled into a nearby parking lot. A.W. became nervous and began walking toward a different bus stop. When Parker drove by a second and third time, A.W. decided to cut through an alley.

> When A.W. did so, Parker drove into the alley, got out of his car, and grabbed her by the arm. A.W. testified that he held a knife to her throat and said he would not harm her if she kept quiet and cooperated. He pushed A.W. toward his car, tied her wrists behind her back with plastic bindings, and shoved her into the backseat so that she was lying on her side, facing the driver's seat.

> A.W. testified that Parker drove for about a half hour to an open area without nearby buildings. Parker then untied her bindings and told her to remove her jacket.[3] He went through A.W.'s jacket and purse, removing four small bags of marijuana and some cash. He again showed A.W. the knife and told her to cooperate in what was just a robbery. After searching through the rest of her things and inside her underwear for money, Parker forced A.W. to disrobe. She testified

---

[1] We refer to T.M. by her initials to protect the victim's privacy.

[2] We refer to A.W. by her initials to protect her privacy. *See* Gen. Order 2011-1 of Division II, In re the Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases, available at: http://www.courts.wa.gov/appellate_trial_courts/.

[3] A.W. also testified that at this point Parker had made her climb over the center console and she was in the front passenger's seat; Parker had also removed the restraints.

2

that he then engaged in vaginal intercourse while holding a knife to her throat, during which she stared at Mardi Gras beads hanging from the rearview mirror.

Afterward, Parker asked A.W. where she lived so he could drive her home, and she gave him an address several blocks away. As he tried to leave, he got temporarily stuck in the snow. When Parker dropped A.W. off, she wrote his license plate number on her hand and walked home.

Within hours, officers found the license plate on a brown sedan with beads hanging from its rear view mirror. After the car's impoundment, they found a knife under the front passenger seat; an expert testified that Parker's fingerprint was on the knife.[4] Officers also found plastic cords[5] in the driver's side door pocket. A.W. identified Parker from a photo montage but was not sure whether the knife from the car was the one he had used. She denied knowing Parker or meeting him to sell drugs.

Parker's ex-girlfriend testified that he arrived at her home on the night of the robbery, looking disheveled. He told her he had used a knife to take marijuana from a girl.[6] She denied telling a detective that she deleted A.W.'s first name and number from Parker's phone.[7]

---

[4] The print was on the tip of the blade.

[5] One of the detectives characterized the cord found in the car as "electrical cord." 7 Report of Proceedings (RP) at 708. According to his ex-girlfriend, Parker was studying to become an electrician.

[6] The ex-girlfriend, Dancia Birka, also testified that Parker told her that he had known the girl through a family member and that either he or the family member had previously purchased marijuana from her. He also told Birka that he had called the girl and arranged to meet her to purchase some drugs. When she got in his car he told her that it was "a lick bitch," took the drugs, and told her to get out of the car. When she would not leave the car, he pulled a knife and forced her out of the car. After he found out his mother's car had been impounded, he was "concerned that the knife was in there." 6 RP at 549. Birka also testified that Parker had given her a $10 bill and that he had thought about leaving for Arizona shortly after the incident.

[7] Birka asserted that she had told the officer that she had deleted a number for an "Amber." 6 RP at 560. Detective Jennifer Quilio later testified that Birka had told her that she had deleted a number for someone with A.W.'s first name from Parker's phone.

3

Detective Brad Graham eventually took A.W. to an open lot outside the city limits where officers believed the robbery had occurred. A.W. became upset when they arrived and said, "This is it." 7 Report of Proceedings at 657. The property owner testified that after a large snowstorm in December 2008, he had noticed tire marks in the snow that looked as though a car had been stuck before gaining traction. A.W. also identified the alley in which Parker grabbed her.

Testing of sperm samples gathered from A.W. revealed the source to be her boyfriend but not Parker.[8] A.W. admitted spending the morning and afternoon before the robbery with her boyfriend.

Officers established that the brown sedan belonged to Parker's mother and that Parker sometimes drove it. After Parker's mother testified that she used the knife under the seat to scrape ice from the windshield, Detective Graham testified that Mrs. Parker could not explain the [why the knife was in the car] when he interviewed her.

*State v. Parker*, 166 Wn. App. 1012, 2012 WL 295425 at *1, 2 (2012).

In addition, A.W. admitted that on the day of the incident, she had told her mother that she was going to spend the day with some friends rather than going see her boyfriend. She also admitted that she had not told her mother that she had had sex with her boyfriend that day. She further admitted that she had first told the nurse who examined her at the hospital that the last time she had intercourse before the incident was in May or June of that year. But when the nurse explained why she was taking certain samples, A.W. told the nurse that she (A.W.) had had intercourse the day before the incident. A.W. testified at trial, however, that she had unprotected intercourse with her boyfriend on the day of the incident.

---

[8] A.W. did not reveal to Detective Graham that she had had intercourse with her boyfriend on the date of the incident until after the officer received the DNA test results from the rape kit in May 2009. The detective testified, however, that he had not previously asked A.W. if she had had sex with another man on the day of the incident.

4

A.W. also denied trying to call anyone immediately after Parker dropped her off near her home. A.W.'s boyfriend, however, testified that she had called him on another person's cell phone that she had borrowed from someone outside a store and told him that she had been raped.

A.W. admitted that during the investigation she had not told the whole truth about having been with her boyfriend, having had intercourse with her boyfriend on the day of the incident, or the marijuana. But she asserted that she had only lied about the things she thought she would get in trouble for.

## II. CLOSING ARGUMENT AND VERDICT

The State began its closing argument by stating:

> Good morning ladies and gentlemen of the jury. December 19th, 2008, [A.W.'s] life was irrevocably changed on that dark, cold day in December. It is no overstatement to say that, on that day, [A.W.] experienced a *waking nightmare*. On that day, she was kidnapped, raped, and robbed by that man, Shamarr Derrick Parker.
> [A.W.] was approached as she waited for the bus on 38th and Pacific. The defendant circled her. She walked away, trying to get away from him. It was a sick and twisted game of cat and mouse.

8 RP at 670 (emphasis added). Parker objected, but before he could explain his objection, the trial court overruled the objection.

The State continued:

> Thus, began a sick and twisted game of cat and mouse. As the defendant stalked [A.W.] as she walked along those snowy streets.
> And then she made a catastrophic error when she walked into that alley trying to get away from the defendant, trying to get to her friend's house. She walked down that alley, and that's when he grabbed her. He grabbed her; he held a knife to her throat; he said, "[C]ooperate, and I won't stab you." He forced her over to the rear part of his mother's car, and he tied her hands behind her back with those plastic ties. He shoved her into the back seat of that car. *Imagine her terror curled up in that car, not knowing whether she was going to live or die, not knowing*

*where she was going to be taken, not knowing whether or not she would ever she her friends or family ever again.*

. . . .

For [A.W.], there is that spark of hope. Maybe she is not going to die. Maybe she is not going to get raped because, surely, by now, that thought has certainly crossed her mind. Maybe this is just going to be a robbery.

Then, the defendant says, "Take off your clothes." She does so because he has that knife. *Imagine her terror sitting there next to naked in this empty field, nowhere to run, nobody to help, no phone to call for help.*

8 RP at 671-72 (emphasis added).

Parker again objected, arguing, "Counsel keeps referring to terror and fear, basically, playing to the prejudices and the passions of the jury as opposed to the facts of the case." 8 RP at 672. The trial court overruled this objection.

The State continued:

*Again, imagine her terror, nowhere to run, nowhere to go for help, nobody to call.* It's just her, the defendant, and the knife.

The defendant climbs on top of her, lifts that lever back, pushes her back, and he rapes her. He rapes her. As he rapes her, his body moves in and out, in and out. *Imagine what [A.W.] must have thought. Imagine how long it must have seemed* for [A.W.], an eternity. She focused on the beads in the rearview mirror, letting her mind wander, trying not to think about the horror that was being perpetrated upon her by the defendant. And then it eventually stops. She gets dressed, and the defendant drops her off with the words, "Well, let this be a lesson to you for walking home alone. I hope you've learned your lesson."[9]

8 RP at 672-73 (emphasis added).

After the State discussed the jury instructions and the elements of the crime, it discussed credibility determinations. It argued to the jury:

---

[9] Parker objected to this as a mischaracterization of the evidence; the trial court overruled that objection.

6

> *Beginning, first, with [A.W.], consider the experience she had to go through, not only was she kidnapped, raped, and robbed, but she had been forced to tell her story over and over and over. It's not just something that ends when she gets home and the door opens and her mom is there. It continues. It continues.* She tells her mom what has happened. She has collapsed on the floor hysterical. She tells the 9-1-1 dispatcher what happens [sic]. Then, she is taken to a hospital in an ambulance. While at the hospital, she is seen by an emergency room doctor, and then she is seen by the [S.A.N.E.[10]] nurse. She has [to] tell the S.A.N.E. nurse all about it. She is interviewed by two officers, Officer Scripps and Officer Hernandez, who arrived at the hospital. She is then interviewed by Detective Graham a couple of different times. *Again, forced to relive it.* She is taken to the scene once it is located by Detective Graham, *forced to relive it. She talks about it in a defense interview, and then she comes in here and she has to tell it to a room full of strangers. What happened to [A.W.] on December 19th, 2008 didn't end on December 19th, 2008. It kept going.*
>
> There is some suggestions made that perhaps [A.W.] was fabricating, that she was mad at her boyfriend because he wouldn't give her a ride home, and she was mad at the defendant—[11]
>
> . . . .
>
> That she was mad at the defendant because he stole tiny bags of dope and that when the door opened when she arrived home and she was late beyond her curfew, she saw her mom's face, and she knew her mom was going to be angry. At that moment, she decided to fabricate a rape. Is that reasonable? It's not reasonable, ladies and gentlemen. It is not reasonable by any stretch of the imagination. She is mad at her boyfriend, Justin Lyons, because he won't give her a ride. What does fabricating a rape get her? She is mad at the defendant because he steals her dope. Isn't that just the cost of doing business if you are, in fact, a drug dealer? She is a few hours late, and the worst thing that happens to her is she gets grounded: So instead of just taking the grounding, she decides to fabricate a rape? None of that is reasonable.
>
> [A.W.] has been remarkably consistent throughout each and every telling of what has happened to her.

8 RP at 677-79 (emphasis added).

---

[10] S.A.N.E. is the acronym for "sexual assault nurse examiner." 5 RP at 365.

[11] Parker objected, arguing that "counsel has to make her own arguments." 8 RP at 678. The trial court overruled that objection.

No. 45163-8

After describing the consistencies in A.W.'s statements and testimony, the State acknowledged that there were some inconsistencies, but it asserted that some inconsistencies were to be expected because the trial took place a year and a half after the incident. The State then argued, "Look at those inconsistencies and ask yourself, do they matter? They don't because across the vast majority of this horrific event, [A.W.], has remained steadfast." 8 RP at 680. After the State described some specific inconsistencies, it argued:

> Well, [A.W.] has been subjected to one of the most horrific things that you can be subjected to. Is she going to be 100 percent accurate on everything? No. In the back seat of the car, is she looking around taking stock of whether or not there is an umbrella or a baby seat or a newspaper in the back seat? She is not taking stock and inventory of what is in the back seat. She's thinking to herself, "Am I going to die? What is going to happen to me?"

8 RP at 682.

After a lunch break, the State resumed its argument by once again referring to the incident as "a waking nightmare." 8 RP at 686. Parker objected, without stating a specific ground; the trial court overruled the objection. The State reiterated that A.W. was experiencing a "waking nightmare," and then described some of the evidence. 8 RP at 686.

At the end of its argument, the State argued:

> Justice Benjamin Cardoz[o] was a former United States Supreme Court Justice, and he said something that is powerful and resonates. *He said that justice, though due the accused, is due the accuser as well.* In this case, justice —

8 RP at 712 (emphasis added). Parker objected, arguing that this statement shifted the burden. The trial court overruled this objection.

8

No. 45163-8

The State continued:

> *Justice in this case is holding the defendant accountable for the waking nightmare that he foisted upon [A.W.]* on December 19, 2008, when he kidnapped her, when he raped her, and when he robbed her.
>
> Ladies and gentlemen, *it's no longer reasonable to doubt that the defendant is guilty* of Kidnapping in the First Degree with Sexual Motivation; *it is no longer reasonable to doubt that the defendant is guilty* of Rape in the First Degree.

8 RP at 712-13 (emphasis added). Parker objected, again arguing that the State was shifting the burden to the defense. The trial court overruled the objection.

The State continued:

> *It is no longer reasonable to doubt that the defendant is guilty* of Robbery in the First Degree. *It is no longer reasonable to doubt* that while doing all three and committing all three acts, the defendant was armed with a deadly weapon. For that reason, ladies and gentlemen, I'm asking that you return a verdict of what the evidence supports, and that verdict is guilty as charged.

8 RP at 713.

In his closing argument, defense counsel argued that A.W. had fabricated the incident to get out of trouble for breaking her curfew and to get revenge on Parker for stealing the marijuana she was planning to sell him. Defense counsel also emphasized the inconsistencies in A.W.'s statements over time and the fact A.W. had withheld information or lied about several facts that could have gotten her into trouble (being with her boyfriend and carrying marijuana) until very late in the investigation. Defense counsel admitted, however, that the State had proven a robbery charge and asked the jury to return a guilty verdict on the lesser offense of second degree robbery because the State had not proved that Parker used a knife in the robbery.

In rebuttal, the State argued:

> Now, when you are dealing with this young woman, think about this, think about that in the middle of this rape, when she is in that dark field and she is trying

to keep her head about herself, she is trying to take her mind out of what is happening, after the rape, when she is asked about how she behaved on the ride home, what did she say? I didn't want him to know he got the best of me.

8 RP at 779. Parker objected to this argument as mischaracterizing the testimony; the trial court overruled the objection. The State continued:

> She wanted to maintain her dignity. He took my body; he took my property; you are not going to have the satisfaction of knowing that it got to me.
> [A.W.] *has weathered two storms. What she suffered at this man's hands and what she suffered on this stand*—[12]
>
> . . . .
>
> —*to carry a truth to you,* that this man kidnapped a girl he saw waiting alone at a bust stop who was vulnerable. He robbed her. He raped her.

8 RP at 779-80.

The jury found Parker guilty of first degree kidnapping and first degree robbery.

### III. APPEAL

Parker appealed his kidnapping conviction, arguing only that there was insufficient evidence to support that conviction because the restraint involved was merely incidental to the robbery. We affirmed the conviction in an unpublished opinion. The direct appeal mandated on July 12, 2012.[13]

Parker now seeks collateral review, arguing that (1) the State engaged several instances of prosecutorial misconduct during closing argument, (2) the trial court erred in admitting testimony

---

[12] Parker objected to this argument without stating any ground; the trial court overruled the objection.

[13] Petitioner filed his petition on July 11, 2013. This petition is therefore timely. RCW 10.73.090(1).

No. 45163-8

from A.W.'s mother and the S.A.N.E. nurse, and (3) appellate counsel was ineffective for failing to raise these issues on direct appeal. We grant this petition.

## ANALYSIS

### I. STANDARD FOR INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Generally, to be entitled to collateral relief a petitioner must establish that (1) he was actually and substantially prejudiced by constitutional error, or (2) his trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). We apply this heightened standard of review to promote finality when the petitioner has had previous opportunities for judicial review. *See In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011) (heightened standard); *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004) (no prior opportunity for review).

But when, as is the case in an ineffective assistance of appellate counsel claim, the petitioner has not had a previous opportunity to obtain judicial review, this heightened standard does not apply. *Coats*, 173 Wn.2d at 132; *Isadore*, 151 Wn.2d at 299. "[A] criminal defendant has a right to have effective assistance of counsel on his first appeal of right," and a defendant's first opportunity to raise an ineffective assistance of appellate counsel claim is often on collateral review. *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). To prevail on such a claim, a petitioner must show that (1) the legal issue appellate counsel failed to raise had merit, and (2) petitioner was actually prejudiced by the failure to raise or adequately raise the issue. *Dalluge*, 152 Wn.2d at 787. A petitioner can show that he was actually prejudiced in this context if he can show that there is a reasonable probability that but for his appellate counsel's

11

unreasonable failure to raise the issue, he would have prevailed on his appeal. *Dalluge*, 152 Wn.2d at 787-88.

## II. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR FAILING TO RAISE PROSECUTORIAL MISCONDUCT

Parker first argues that the State engaged in prosecutorial misconduct when it (1) appealed to the jury's passion and prejudice, (2) improperly commented on Parker's right to trial and right to confront witnesses by telling the jury that A.W. had been forced to relive the incident because she had been forced to tell her story over and over and forced to tell the story to the jury, and (3) shifted the burden of proof to Parker by arguing that it was no longer reasonable to doubt Parker's guilt. He also argues that his appellate counsel was ineffective for failing to raise these prosecutorial misconduct claims on direct appeal. We agree that appellate counsel was ineffective for failing to raise the appeal to passion and prejudice prosecutorial misconduct claim on direct appeal.

### A. PROSECUTORIAL MISCONDUCT STANDARDS

To succeed on this ineffective assistance of appellate counsel claim, Parker must show that his prosecutorial misconduct claim had merit. *Dalluge*, 152 Wn.2d at 787. To establish prosecutorial misconduct during closing argument, Parker must first establish that the argument at issue was improper. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). If he meets this burden, we must then determine whether the improper statements were prejudicial. *Emery*, 174 Wn.2d at 755. Prejudice exists when there is a substantial likelihood that the misconduct affected the verdict. *Id.* at 760-61. We review a prosecutor's remarks during closing argument in

the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

## B. IMPROPER ARGUMENT

Parker first argues that the State's repeated characterization of the incident as a "waking nightmare" and repeated request that the jury "imagine [A.W.'s] terror" during the incident amounted to an improper appeal to the jury's passion and prejudice. Br. in Support of PRP (PRP) at 22-23, 25. Parker objected to these references on the same grounds. We agree with Parker that the repeated invitations to the jurors to "imagine [A.W.'s] terror" were improper when we consider the State's argument as a whole.

The State has wide latitude in closing argument to the jury and may draw reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). An appeal to the jury's "passion and prejudice" through use of inflammatory rhetoric, however, is misconduct. *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988).

Parker relies on *State v. Claflin*, 38 Wn. App. 847, 850-52, 690 P.2d 1186 (1984), for the premise that it is serious misconduct for the State to tell the jurors to place themselves in the victim's position and "exhort them to decide the case based on the resulting passions and prejudices." PRP at 25. The State argues that the argument here was not a bare appeal to passion and prejudice, as was the case in *Claflin*, but, rather references to the heinous nature of the crimes and their effect on the victim, which is proper argument.

In *Claflin*, the State, over Claflin's objection, "read a poem by an anonymous rape victim to show 'most poignantly' how one of Claflin's victims 'probably felt.'" *Claflin*, 38 Wn. App. at 849. On appeal, Claflin, who had been convicted of rape and indecent liberties perpetrated

13

against two young girls, argued that the State's closing argument appealed to the jurors' passions and prejudices and assumed facts not in evidence. *Id.* at 849. We agreed, stating that "[i]n such an emotionally charged trial, the use of a poem utilizing vivid and highly inflammatory imagery in describing rape's emotional effect on its victims was nothing but an appeal to the jury's passion and prejudice." *Id.* at 850-51 (citing *State v. Stacy*, 355 S.W.2d 377, 380-81 (Mo. 1962)). We also determined that the poem contained several prejudicial allusions to matters outside of the evidence presented at trial and held that the reading of the poem was so prejudicial it could not have been cured. *Claflin*, 38 Wn. App. at 851. We acknowledged, however, that a reference to the heinous nature of a crime and its effect on the victim can be proper argument if it does not appeal to the passion and prejudice of the jury. *Id.* at 849-50.

Although the State's argument here was not as egregious as the improper argument in *Claflin*, the State's invitations to the jurors to "imagine her terror" were not just references to the nature of the crime or its effect on A.W.; they amounted to an appeal to the jurors' passions and prejudices. 8 RP at 671-72. Asking the jurors to "imagine her terror" in "not knowing whether she was going to live or die, not knowing where she was going to be taken, not knowing whether or not she would ever she her friends or family ever again," and to "imagine her terror sitting there next to naked in this empty field, nowhere to run, nobody to help, no phone to call for help," served no purpose other than to evoke the jurors' sympathies for A.W. and arouse their prejudices against Parker. 8 RP at 671-72. Even though the State argued that the horrific nature of the experience could explain some inconsistencies between A.W.'s statements and her testimony, the State did not make such an argument until much later in its closing, and it never tied that argument to the argument at issue here.

Furthermore, the State's later (1) emphasis on how traumatic it was for A.W. to essentially relive the incident every time she talked to someone about it and when she testified at trial, (2) argument that justice was also due the "accuser," and (3) reference to what A.W. had "suffered at this man's hands and what she suffered on [the] stand" to "carry a truth" to the jury, although arguably not improper arguments in their own right, contributed to this error. These arguments magnified the State's argument appealing to the jury's passion and prejudice by repeatedly drawing the jurors' attention to the emotionally devastating aspects of this incident. 8 RP at 712, 779-80. Accordingly, we hold that this argument was improper.

### C. SUBSTANTIAL LIKELIHOOD MISCONDUCT AFFECTED THE VERDICT

If Parker can show that we would have found this error prejudicial and reversed his convictions on direct appeal, he is entitled to collateral relief based on ineffective assistance of appellate counsel. Because Parker objected to this argument, he would have been able to establish prejudice on direct appeal if he could show that there is a substantial likelihood that the misconduct affected the verdict. *Emery*, 174 Wn.2d at 760. We hold that there was such a likelihood here.

This case ultimately came down to A.W.'s credibility. In cases in which credibility determinations are key, there is a substantial risk that the jury's verdict could be affected by an improper appeal to the jury's emotions. *See State v. Padilla*, 69 Wn. App. 295, 302, 846 P.2d 564 (1993) (in a swearing contest, the likelihood improper questioning about another witness's veracity affected the verdict is substantial). Parker acknowledged in closing argument that the evidence was sufficient to establish a robbery when he asked the jury to convict him of the lesser second degree robbery offense. He did not, however, acknowledge that he had kidnapped A.W. or committed first degree robbery by robbing her with a deadly weapon. All of the evidence related

to the kidnapping and much of the evidence regarding whether Parker used a knife was based on A.W.'s statements to others and her testimony, so the jury's credibility determinations were vital. Given this, we hold that there was a substantial likelihood that the misconduct affected the verdict and if appellate counsel had raised this claim on direct appeal, we would have found prosecutorial misconduct. Thus, Parker was prejudiced because he would have prevailed had the challenge been raised in his direct appeal. Accordingly, Parker has shown that he received ineffective assistance of appellate counsel on this ground.

Accordingly, we grant this petition, reverse the convictions, and remand for further proceedings. Because we grant the petition on this ground, we do not reach any of the other issues because they can either be addressed on remand or may not reoccur.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

BJORGEN, A.C.J.

LEE, J.