# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51277-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JENNIFER A. BROCKETT, | |
| Appellant. | |

GLASGOW, J. — Jennifer Brockett had a fight with her boyfriend in her car one evening after they had been out drinking. She left the car on foot, walked for a while, and eventually entered a stranger's garage. The next morning, the owner discovered that someone had been in his garage and several items were missing, including his wallet. Brockett was convicted of residential burglary, second degree vehicle prowling, and second degree identity theft.

Brockett appeals, arguing that she received ineffective assistance of counsel for her counsel's failure to request a voluntary intoxication jury instruction. She also contends that the trial court violated her right to present a defense when it excluded her mother's testimony about her tendency to react irrationally when she is under stress. She asserts that the State presented insufficient evidence to support her residential burglary conviction because the garage was not a dwelling. Finally, she challenges the imposition of a criminal filing fee and DNA collection fee.

We affirm Brockett's convictions and remand for the trial court to address whether the criminal filing fee and DNA collection fee should be imposed.

FACTS

On the night of May 2, 2015, Brockett and her boyfriend left a casino where they had been drinking and arguing. The argument continued in her car where Brockett's boyfriend slapped her. He then pulled over on the side of the road. They both got out of the car and began walking in separate directions. Brockett was barefoot. She was "very intoxicated and a little out of control" when she "staggered" away from the car toward a 24-hour convenience store. Verbatim Report of Proceedings (VRP) (Vol. II) at 209.

Brockett cut her foot and it started bleeding. She saw a house with lights on and walked toward it to seek help and refuge. She knocked on the door but nobody answered. She then entered the garage through a side door to look for something to bandage her foot.

The garage was attached to the house via a covered, but open, walkway. The garage had its own door that was unconnected to the house; a person would have to exit the house, go outside, and access a separate door to enter the garage. The house and garage had a contiguous roof and a shared wall, but they had separate doors to the outside, and there was a walkway between the doors. In addition, there was undisputed testimony that the garage was "absolutely attached to the house, but you do have to go into the elements to get outside, but it is one piece." VRP (Vol. I) at 138-39.

The next thing Brockett remembered after entering the garage was waking up in the car that was parked in the garage. She explained that she had been in a blackout for part of the night but had "sobered up a little" when she woke up. VRP (Vol. II) at 215. She later testified that she then opened the garage's large sliding door and walked out without taking anything. According to Brockett, she was in the garage for about 20 minutes and left immediately after waking up.

The owner of the house, Jack Owens, awoke the next morning to find the large garage door partly open, blood in and around his car, and several items missing from the garage. Among the missing items, valued around $800, were his wallet containing credit cards and identification, a bicycle, a backpack, a tent, a folding chair, and several tools. The car stereo was also ripped out of the dashboard and sitting on the seat, and the stereo faceplate was missing.

Detective Brandon McNew, then a patrol officer, arrived later that day to investigate and document the scene. He took a sample of the blood found in the garage and sent it to the crime lab for testing. That sample matched a sample of Brockett's DNA already on file with the police. McNew then contacted and arrested Brockett and obtained a sample of her DNA. A forensic scientist later testified that this newly obtained sample matched the sample taken from the garage. Brockett was charged with residential burglary, second degree theft, second degree vehicle prowling, and second degree identity theft.

At trial, Brockett and McNew testified consistent with the above facts. In addition, McNew testified that during his interview of Brockett, she initially denied ever being in Owens's garage, but then admitted she was there after McNew told her the police had obtained a DNA profile for the blood found in the garage. McNew testified that Brockett then admitted to taking the tools, wallet, and stereo faceplate, putting them in the backpack, and riding off on the bicycle. She denied taking the tent and folding chair. McNew further testified that Brockett told him she left the stolen items in an alley.

Brockett contested McNew's description of the interview. She testified that she did not admit to taking anything during this interview, but rather McNew had described what he thought she had done and then asked her whether his characterization of the event was accurate. Brockett

claimed that she had replied it was "possible" that she had taken those items as he described because she could not remember everything from that night. VRP (Vol. II) at 217. "I told him I did not remember doing any of that stuff. . . . I remember telling him I did not remember doing any of that or that I did not do it." VRP (Vol. II) at 240.

Brockett further testified to her intoxication that night by saying "that could have happened because I was so intoxicated and I have been—there is parts of that night that I don't remember and there is things that—and I have been intoxicated like that one other time where people have told me things that I did when I was drinking and I was shocked that they were telling me these things that I did because I do not remember doing them." VRP (Vol. II) at 215. When asked why she entered the garage rather than seeking refuge or help elsewhere, she replied that she was "intoxicated" and "plastered," and explained: "I have no logical explanation for my actions. . . . I was intoxicated. . . . My logic and reason and my function were highly affected." VRP (Vol. II) at 229, 231-32. "I started feeling a little desolate and desperate . . . [a]fter walking for so long and being intoxicated and feeling completely helpless." VRP (Vol. II) at 233-34.

Brockett's testimony contained some inconsistencies. She testified she did not take anything from Owens's garage, but also said that she had admitted to McNew that it was possible she had taken some things because she could not remember everything from that night. And although Brockett repeatedly said she was very intoxicated that night, when the prosecutor asked her whether she understood when she woke up that it was wrong for her to be in Owens's garage, she also repeatedly admitted that she knew that she should not be there and left immediately.

Brockett's mother, Mary Christine Brockett,[1] also testified. At one point defense counsel asked her if it had been easy to raise Brockett. The State objected for relevance and the court sustained. Defense counsel explained that she was trying to establish Brockett's state of mind on the night in question, and the State objected again on the basis that Christine did not see Brockett that night and so had no knowledge of her state of mind at that time. The court replied: "I'm not sure that that—there may be some relevancy, but I don't think this witness would be able to testify to that." VRP (Vol. II) at 261. Defense counsel explained: "Not as to her frame of mind actually that night but how she gets under situations of stress." VRP (Vol. II) at 261. The State objected for relevance and the court sustained.

Prior to closing arguments, when the State expressed its concerns to the court that it would be improper for Brockett to raise a voluntary intoxication defense, defense counsel replied: "I don't know what he's talking about." VRP (Vol. II) at 302. The jury did not receive an instruction on voluntary intoxication, though it was instructed on intent generally.

During closing argument, defense counsel did not argue that Brockett was so drunk that she could not form the intent required for conviction of the charged crimes. Instead, defense counsel discussed Brockett's intoxication as support for her argument that Brockett was merely seeking refuge when she entered the garage. The State also used Brockett's intoxication to explain her behavior in its closing argument, presenting it as a reason she may have acted erratically or irrationally.

The jury convicted Brockett of residential burglary, second degree vehicle prowling, and second degree identity theft, but acquitted her of second degree theft. Because she had several

---

[1] For the sake of clarity, we refer to Mary Christine Brockett as Christine, the name she uses.

prior convictions, Brockett was sentenced to 72 months on her residential burglary conviction, 364 days for vehicle prowling, and 57 months for identity theft, all to be served concurrently. The court imposed a $200 criminal filing fee and a $100 DNA collection fee, but also found Brockett to be indigent.

Brockett appeals.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Brockett argues that she received ineffective assistance of counsel based on her trial counsel's failure to request a jury instruction on voluntary intoxication and to argue her intoxication compromised her ability to form an intent to commit a crime. We disagree.

A.    Ineffective Assistance of Counsel Standards

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right of a criminal defendant to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). Washington follows the *Strickland* test: the defendant must show both that counsel's performance was deficient and the deficient performance prejudiced the defense. 466 U.S. at 687; *State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2001).

A defendant bears the burden of establishing deficient performance. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Trial counsel's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "There is a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856,

862, 215 P.3d 177 (2009). To demonstrate deficient performance, a defendant must show in the record the absence of legitimate strategic or tactical reasons supporting counsel's challenged conduct. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). In evaluating ineffectiveness claims, we must be highly deferential to counsel's decisions. *State v. Michael*, 160 Wn. App. 522, 526, 247 P.3d 842 (2011).

To show prejudice, the defendant must show that counsel's errors "were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. In other words, the defendant must show "'a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting *Kyllo*, 166 Wn.2d at 862). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Thus, to prevail on appeal on this issue, Brockett must show that she was entitled to a voluntary intoxication instruction, defense counsel's decision not to ask for the instruction was not based on a legitimate trial strategy, and defense counsel's decision prejudiced Brockett.

B.      Brockett Would Have Been Entitled to a Voluntary Intoxication Instruction

RCW 9A.16.090 provides that voluntary intoxication does not make an act any less criminal, "but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state." "'Evidence of voluntary intoxication is relevant to the trier of fact in determining in the first instance whether the defendant acted with a particular degree of mental culpability.'" *Thomas*, 109 Wn.2d at 227 (quoting *State v. Coates*, 107 Wn.2d 882, 889, 735 P.2d 64 (1987)). Washington Pattern Jury Instruction 18.10 further provides

that "evidence of intoxication may be considered in determining whether the defendant [acted with the required mental state]." WASH. PATTERN JURY INSTRUCTIONS: CRIMINAL 18.10 (4th ed.) (2016) (alteration in original).

A defendant is entitled to a voluntary intoxication instruction when (1) the crime charged includes a mental state, (2) there is substantial evidence of drinking, and (3) there is evidence that the drinking affected the defendant's ability to form the requisite intent or mental state. *State v. Kruger*, 116 Wn. App. 685, 691, 67 P.3d 1147 (2003). First, each of the crimes for which Brockett was convicted required a particular mental state—some level of knowledge or intent—in order to support a conviction, and the jury was instructed on this element of each charge. For residential burglary, she had to unlawfully enter or remain in a dwelling with intent to commit a crime therein. RCW 9A.52.025(1). For vehicle prowling, she had to unlawfully enter or remain in a vehicle with intent to commit a crime therein. RCW 9A.52.100(1). And for second degree identity theft, she had to obtain, possess, use, or transfer a means of identification of another person knowingly and with intent to commit, or to aid or abet, any crime. RCW 9.35.020(1). Thus, each crime charged required proof of a particular mental state.

Second, we consider whether there was substantial evidence of drinking. *Kruger*, 116 Wn. App. at 691. The evidence of Brockett's intoxication was undisputed. She had been drinking with her boyfriend that night, and then left her car in the road with the keys in the ignition. She was barefoot. She testified that she blacked out and woke up in Owens's car. She testified that she could not remember everything that happened that night. And similar to *Thomas*, Brockett presented evidence that she had blacked out from drinking before. *Thomas*, 109 Wn.2d at 225. Finally, the State emphasized her intoxication during closing.

Third, there was also evidence that Brockett's intoxication affected her ability to form the required mental state. *Kruger*, 116 Wn. App. at 691. Brockett testified she was very intoxicated and confused when she entered the garage and the vehicle. She passed out and it is unclear how much time passed before she woke up.

Instead of disputing her intoxication, the State relies on her testimony that she had sobered up to some extent before she left the garage. While Brockett did testify that she woke up, realized she should not have been there, and left immediately without taking anything, she also said that it was possible she took some items after she woke up because she was so drunk she could not remember everything. At different times she both denied taking anything and said she was too drunk to remember. But it is generally permissible for a defendant to argue inconsistent defenses, as long as they are supported by the evidence. *State v. Frost*, 160 Wn.2d 765, 772, 161 P.3d 361 (2007). As Division One observed in *State v. Gabryschak:*

> Intoxication is not an all-or-nothing proposition. A person can be intoxicated and still be able to form the requisite mental state, or he can be so intoxicated as to be unconscious. Somewhere between these two extremes of intoxication is a point on the scale at which a rational trier of fact can conclude that the State has failed to meet its burden of proof with respect to the required mental state.

83 Wn. App. 249, 254, 921 P.2d 549 (1996) (internal citation omitted).

Here, there was evidence that after Brockett woke up she was sufficiently coherent to form the intent necessary for conviction, but there was also substantial evidence that she was not, including that she blacked out and lost consciousness long enough to leave a pool of blood in the car. The outcome would depend on what the jury believed. Therefore, we conclude that Brockett would have been entitled to a voluntary intoxication instruction had she requested one.

C.      Counsel Was Not Deficient When She Did Not Request an Instruction

Next we address whether counsel was deficient because she did not request the instruction and argue that voluntary intoxication affected Brockett's ability to form the required intent. The fact that a defendant is entitled to obtain a voluntary intoxication instruction does not necessarily mean that counsel performed deficiently when she did not do so, especially where the defendant is presenting a defense like denial.

Brockett's defense was based on denial. Brockett testified that she remembered walking out of the garage empty-handed and without a bike. Defense counsel argued in closing that if that were true, anyone could have entered the garage through the door Brockett left open. An alternate theory that Brockett was too drunk to remember anything would have weakened the defense of denial. Moreover, while the evidence was sufficient to support a voluntary intoxication instruction, there was also evidence that Brockett was adequately aware of the situation to make conscious decisions, such as seeking refuge in the garage and leaving the garage as soon as she woke up and realized she should not be there. It was a legitimate strategy to avoid the risk of undermining Brockett's denial.

Brockett also points out that when the State expressed concerns that there had been insufficient evidence presented to support a diminished capacity defense, defense counsel replied: "I don't know what he's talking about," suggesting perhaps that she had not considered the defense. VRP (Vol. II) at 301-02. But to demonstrate deficient performance, a defendant must show in the record the absence of legitimate strategic or tactical reasons supporting counsel's challenged conduct. *Emery*, 174 Wn.2d at 755. Here, defense counsel's lone comment does not show that she utterly lacked any legitimate strategic reason to rely on the defense of denial rather

10

than ask for the instruction. The record does not reveal the tone in which this response was made. As discussed above there were tactical reasons that supported a decision not to request a voluntary intoxication instruction.

We hold that Brockett failed to show that defense counsel was deficient for not requesting an involuntary intoxication instruction or arguing intoxication prevented her from forming intent. Her claim of ineffective assistance of counsel fails.

## II. RIGHT TO PRESENT A DEFENSE

Brockett argues the trial court violated her right to present a defense by excluding her mother's testimony regarding her state of mind. We disagree.

A.      Standard of Review for Trial Court's Exclusion of Defense Evidence

A defendant's right to present a defense is not absolute: the evidence that a defendant desires to introduce "'must be of at least minimal relevance'" because a defendant has no right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). To prevail on a claim that she was deprived of her Sixth Amendment right, Brockett must at least make some plausible showing of how the subject of the testimony would have been both material and favorable to her defense. *State v. Gonzalez*, 110 Wn.2d 738, 750, 757 P.2d 925 (1988); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987).

Our first step, therefore, is to review for abuse of discretion the trial court's assessment of whether the excluded evidence was relevant. *State v. Lee*, 188 Wn.2d 473, 486-93, 396 P.3d 316 (2017); *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017); *State v. Blair*, 3 Wn. App. 2d 343, 350-52, 415 P.3d 1232 (2018); *State v. Horn*, 3 Wn. App. 2d 302, 310, 415 P.3d 1225

(2018).[2]  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons.  *Lee*, 188 Wn.2d at 486.

B.       The Court Did Not Abuse Its Discretion

Had she been permitted to testify on Brockett's state of mind, Christine would have explained how Brockett typically reacts in stressful situations, which Brockett argues was relevant to explain her state of mind in entering Owens's garage after fleeing an altercation with her boyfriend in the middle of the night.  As an initial matter, Brockett argues that it was improper for the trial court to exclude this testimony based on the rules of evidence that address relevance.  She contends, without citation to authority, that "Washington courts have repeatedly held that where the right to present a defense is implicated, the proper legal standard is not provided by the rules of evidence, but rather by Darden and Jones."  Br. of Appellant at 29.  But *Darden* and *Jones* make clear that there is no constitutional right to present irrelevant evidence, and the question of relevancy is governed by the rules of evidence.  *Jones*, 168 Wn.2d at 720; *Darden*, 145 Wn.2d at 622.  We reject this argument.

Brockett also argues that the trial court ruled this testimony was relevant.  But the court did not actually rule that the sought-after testimony was relevant.  Defense counsel asked Christine if it had been easy to raise Brockett, the State objected for relevance, and the court sustained.  Defense counsel explained that she was trying to establish Brockett's state of mind on the night in question, and the State objected again, on the basis that Christine did not see Brockett on the night

---

[2] There has been a recent split of authority about the structure of the legal test for establishing a violation of the Sixth Amendment right to present a defense.  *Lee*, 188 Wn.2d at 486-93; *Clark*, 187 Wn.2d at 648-49; *Blair*, 3 Wn. App. 2d at 350-52; *Horn*, 3 Wn. App. 2d at 310.  We need not resolve it to decide this case.

in question and so could not testify to her state of mind at that time. The court replied: "I'm not sure that that—there may be some relevancy, but I don't think this witness would be able to testify to that." VRP (Vol. II) at 261. Defense counsel explained: "Not as to her frame of mind actually that night but how she gets under situations of stress." VRP (Vol. II) at 261. The State objected for relevance, and the court sustained. Defense counsel did not provide any other information or offer of proof.

Viewing the entire exchange in context, it is clear the trial court thought testimony on Brockett's state of mind *that night* may be relevant, but was inadmissible because Christine could not have personal knowledge of Brockett's state of mind at the time because she was not present. ER 602. However, once defense counsel explained she was offering testimony on Brockett's general character and how she typically reacts under stress, the court sustained the State's objection for relevance. Thus, the court did exclude this evidence because it was not relevant.

The issue then is whether the court abused its discretion in excluding testimony from Christine on how Brockett typically reacts in stressful situations based on relevance. Brockett argues that Christine's testimony was relevant to her state of mind on that night because it would have supported Brockett's version of events—that she only entered the garage to seek refuge because she was afraid. Brockett contends that it also explained why her behavior that night was plausible, even if it was inconsistent with how other people would have reacted in that situation. Brockett asserts Christine's testimony was also relevant to the issue of whether Brockett had in fact truthfully confessed to taking items from the garage during questioning by McNew. Specifically, Brockett argues that Christine's testimony would have supported Brockett's

13

suggestion that she was intimidated and flustered by McNew's questions because Christine would have described how Brockett is generally paranoid and easily frightened.

Neither party discusses the specific rules that address character traits. Under ER 404(a), evidence of a person's trait of character is generally not admissible to prove action in conformity therewith. But under an exception in ER 404(a)(1), "[c]haracter of [the] [a]ccused," "[e]vidence of a pertinent trait of character offered by an accused" is admissible. Our Supreme Court has held that the term "pertinent" is synonymous with relevance. *City of Kennewick v. Day*, 142 Wn.2d 1, 6, 11 P.3d 304 (2000). Thus, a pertinent character trait is one that tends to make the existence of any material fact more or less probable than it would be without evidence of the character trait. *Id.* Reputation evidence that is specifically pertinent or relevant to the mental state element of the crime is admissible if offered by a criminal defendant. *Id.* at 8.

But under ER 405(a), which establishes methods of proving character, "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation." *See also, Day*, 142 Wn.2d at 8. Reputation testimony must address a person's reputation in the community, and reputation within a person's family is neither neutral enough nor sufficiently reflective of a community. *State v. Thatch*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005). Thus, Brockett did not lay the proper foundation for offering reputation evidence under ER 405(a) because Christine would only have testified to Brockett's reputation within her own family. In addition, the limited information that Christine could properly testify about— Brockett's reputation within her own family—was not relevant.

To the extent that Brockett wanted to introduce evidence of specific instances of conduct in order to prove a trait of character under ER 405(b), she has not shown that Christine's testimony

about Brockett's character was relevant to an essential element of a charge or defense as required under that portion of the rule. *Id.*

Because Christine's proposed testimony lacked foundation to be admitted to establish her reputation in the community, and it was not otherwise relevant, the trial court did not abuse its discretion when it excluded the testimony. Nor did exclusion of this testimony violate Brockett's constitutional right to present a defense.

### III. SUFFICIENCY OF THE EVIDENCE

Brockett argues there was insufficient evidence to support her conviction for residential burglary because Owens's garage is not a portion of a dwelling under RCW 9A.04.110(7). We disagree.

A.     Definition of Dwelling and Standard for Evaluating Sufficiency of the Evidence

Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Imokawa*, 4 Wn. App. 2d 545, 560, 422 P.3d 502 (2018), *review granted*, 192 Wn.2d 1016 (2019). A claim of insufficiency admits the truth of the State's evidence. *Id*. We draw all reasonable inferences in favor of the State and interpret them most strongly against the defendant. *Id.* Circumstantial evidence and direct evidence carry equal weight. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, they enter or remain unlawfully in a dwelling other than a vehicle. RCW

9A.52.025(1). A "dwelling" is any building or structure, *or a portion thereof*, which is used or ordinarily used by a person for lodging. RCW 9A.04.110(7). Whether a building is a dwelling "'turns on all relevant factors and is generally a matter for the jury to decide.'" *State v. Hall*, 6 Wn. App. 2d 238, 241, 430 P.3d 289 (2018) (quoting *State v. McDonald*, 123 Wn. App. 85, 91, 96 P.3d 468 (2004)).

B.     There Was Sufficient Evidence for the Jury to Conclude That the Semi-Attached Garage Was a Portion of a "Dwelling"

Here, there was no evidence that anyone was using the garage for lodging. Thus, the issue is whether the garage constitutes "a portion" of Owens's house. RCW 9A.04.110(7).

Washington courts consider spaces that are part of a larger building that is used for lodging to be a portion of a dwelling. *See State v. McPherson*, 186 Wn. App. 114, 115-17, 344 P.3d 1283 (2015) (ground-level jewelry store was part of a dwelling because there was an occupied apartment above it and the only way to access the apartment was through the jewelry store); *State v. Neal*, 161 Wn. App. 111, 112-15, 249 P.3d 211 (2011) (tool room inside a residential apartment building was a portion of a dwelling). We have also held that garages connected to dwellings are portions of the dwellings. *State v. Murbach*, 68 Wn. App. 509, 513, 843 P.2d 551 (1993).

In this case, Owens's garage was attached to the house via a covered, but open, walkway. The garage had its own door to the outside. But exhibits 2 and 6 show that the house and garage had a contiguous roof and they appear to share a wall with no space between them. In addition, there was undisputed testimony that the garage was "absolutely attached to the house, but you do have to go into the elements to get outside, but it is one piece." VRP (Vol. I) at 138-39.

Under the facts of this case, there was sufficient evidence for the jury to conclude that Owens's garage constituted a portion of a dwelling under RCW 9A.04.110(7).

### IV. LEGAL FINANCIAL OBLIGATIONS

Brockett argues the criminal filing fee and the DNA collection fee were improperly imposed. The State has not responded.

In 2018, the legislature amended RCW 36.18.020(h), prohibiting the imposition of the criminal filing fee if a defendant is indigent as defined in RCW 10.101.010(3)(a)-(c). LAWS OF 2018, ch. 269, § 17. The legislature also amended RCW 43.43.7541 in 2015, authorizing the imposition of a DNA collection fee "unless the state has previously collected the offender's DNA as a result of a prior conviction." LAWS OF 2018, ch. 269, § 18. Our Supreme Court has held that the 2018 amendments to the legal financial obligations statutes apply to cases pending on direct review and not final when the amendments were enacted. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

The court found Brockett to be indigent for purposes of appeal but did not indicate whether indigency was based on RCW 10.101.010(3)(a)-(c). And the State has not conceded that Brocket is indigent under this particular statutory definition. Given the evidence regarding a DNA match in this case, it is clear Brockett's DNA has previously been collected. Therefore, we remand to the sentencing court to address the criminal filing fee and the DNA collection fee by applying the 2018 legislative amendments and our Supreme Court's holding in *Ramirez*.

No. 51277-7-II

CONCLUSION

We affirm Brockett's convictions and remand for the trial court to address the criminal filing fee and DNA collection fee in light of the new legislation and *Ramirez*.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Melnick, P.J.

Sutton, J.